CLARENCE H. VENNER, Appellant, *vs.* THE CHICAGO CITY
RAILWAY COMPANY *et al.* Appellees.

*Opinion filed April 19, 1913—Rehearing denied June 5, 1913.*

1. TRUSTS—*men may create a trust in their personal property
for any lawful purpose.* The owners of personal property may
create a trust therein for any purpose they deem best, so long as
the purpose is not prohibited by statute or some rule of public
policy.

2. CORPORATIONS—*trust in stock of corporation for purpose of
controlling it is not illegal.* There is no statute in Illinois which
prohibits a trust of the stock of a corporation for the purpose of
controlling its management, and no rule of public policy which
prohibits the combination of the owners of a majority of the stock
of the corporation for the purpose of controlling the corporation.

3. SAME—*stockholders may agree beforehand to vote for certain persons as directors.* Stockholders can control the affairs of
the corporation only through the election of directors, at which
election there is necessarily a combination of shares, and while
such combination may be made at the time of the meeting, yet
there is no reason why the stockholders may not agree beforehand
to vote for certain persons as directors.

4. SAME—*owners of majority of stock may give proxies to the
same person.* There is nothing in the law to prevent the owners
of the majority of stock in a corporation from giving proxies to
the same person, and, unless restricted by its terms or some statutory provision, a proxy confers on the grantee a discretion, unlimited either in character or duration, until revoked.

5. SAME—*a majority of stockholders may confer unrestricted
voting power upon trustee.* A majority of stockholders may, by
uniting in the same proxy, confer upon the grantee an unlimited
discretion to vote their stock, and there is no policy of the law to
prevent their transferring the stock to a trustee with like unrestricted power.

6. SAME—*purpose for which a trust is created determines its
legality.* The fact that the majority of the stockholders in a corporation confer upon certain trustees an unrestricted power to vote
their stock does not necessarily make such trust illegal, as it is the
purpose for which the trust is created which determines its legality.

7. SAME—*pooling of stock for purpose of controlling corporation is not necessarily illegal.* The pooling of stock by the owners
for the purpose of electing directors and officers and controlling
the management and business of the corporation is not against pub-

lic policy, so long as no fraud is committed or wrong done to the other stockholders.

8. SAME—*effect of transfer of stock to the Chicago City and Connecting Railways Collateral Trust.* The effect of the transfer of the stock of the Chicago City Railway Company to the Chicago City and Connecting Railways Collateral Trust was to place the legal title to the majority of the stock of the Chicago City Railway Company in the trustees, together with the voting power, which was thus separated from the beneficial ownership existing in the holders of the participation certificates but is to be exercised in accordance with the wishes of such holders as expressed by a committee chosen by them for that purpose, and such trust is not necessarily illegal.

9. SAME—*when stockholders are not deprived of deliberative powers by trust agreement.* The fact that the election of directors of a corporation is to be by trustees, to whom the legal title to a majority of the stock has been assigned, together with the voting power, does not deprive the stockholders of their deliberative powers or divest them of all control of the corporation, where the trust agreement requires the trustees to vote as directed by a committee selected by the participation shareholders, who are the beneficial owners of the stock.

10. SAME—*what does not render trust agreement illegal.* Participation shareholders under a trust agreement, who are the owners of the majority of the stock in a street railway corporation, have a right to control the election of directors and officers and the management of the business through a committee selected by themselves so long as no fraud or wrong is committed against the other stockholders; and the mere facts that such participation shareholders are owners also of other corporations, and that they have committed the management of such corporations to boards of directors composed of the same persons as the board of directors of the street railway corporation, do not, of themselves, render the trust agreement illegal.

11. SAME—*what combinations of corporations or individuals are ordinarily unlawful.* Combinations and associations of corporations or of individuals by which the control of competing corporations is vested in a single ownership, with the effect of destroying competition, limiting production, enhancing prices or monopolizing business, are ordinarily unlawful.

12. SAME—*constitutional provision against the consolidation of competitive railroads does not apply to street railways.* The prohibition contained in section 11 of article 11 of the constitution against the consolidation by any railroad corporation of its stock, property or franchises with any other railroad corporation owning

a parallel or competing line, does not apply to street railway companies.

13. SAME—*it is for a city to determine whether the operation of street railways shall be competitive or monopolistic.* The constitution commits to cities the control of the operation of street railways in its streets, and it is for the city to determine whether such operation shall be competitive or monopolistic and whether it shall grant the privilege to many or confine it to one.

14. SAME—*city council may declare the public policy as to operation of street railways.* The city council has authority to declare the public policy of the city in regard to the operation of street railways within the city, and by the passage of the ordinance of February 11, 1907, and subsequent street railway ordinances, the city of Chicago has abandoned the principle of competition between the street railways of the city and has declared for the joint operation of street railway lines under a single management.

15. SAME—*combination or merger of street railway companies in city of Chicago is not now against public policy.* Under the various street railway ordinances passed by the city of Chicago since February 11, 1907, the combination, union or merger of two or more street railway lines in Chicago for the joint operation of such lines under a single management is not against public policy. (*South Chicago City Railway Co.* v. *Calumet Electric Street Railway Co.* 171 Ill. 391, explained.)

16. SAME—*what provision of trust agreement does not render entire agreement invalid.* The provision of the trust agreement whereby the trustees of the Chicago City and Connecting Railways Collateral Trust are authorized to transfer shares to any person to qualify him as a director or for the purpose of maintaining the organization of the company is not an essential part of the agreement, and even if such provision were invalid it would not invalidate the trust agreement as a whole but might be disregarded.

17. SAME—*name "Chicago City and Connecting Railways Collateral Trust" does not imply a corporation.* The name "Chicago City and Connecting Railways Collateral Trust" does not imply a corporation, as a trust may be incorporated or unincorporated, and the adoption of such name does not, of itself, amount to the assumption of a fictitious corporate name, in violation of law.

18. SAME—*the act of 1855 authorizes operating agreements between street railway companies.* As section 11 of article 11 of the constitution, prohibiting the consolidation of parallel or competing railroads, does not apply to street railways, the act of 1855 (Hurd's Stat. 1911, par. 44, p. 1820,) is still authority for the making of operating agreements between street railway companies.

19. SAME—*present situation with reference to consolidation of surface street railways and elevated railroads.* At present the constitution forbids the consolidation of railroad corporations owning parallel or competing lines and the statute authorizes the consolidation of corporations of the same kind, only, and in no event can a consolidation or merger of surface lines of street railways with elevated railroads take place without the consent of the city by the passage of an ordinance.

20. INJUNCTION—*mere apprehension of illegal action by directors is not ground for injunction.* The mere apprehension or fear on the part of a stockholder in a corporation that the directors may take some illegal action is not ground for an injunction, but the act to be enjoined must be one the doing of which is actually threatened and may be expected with reasonable certainty if not enjoined.

APPEAL from the Superior Court of Cook county; the Hon. CHARLES A. McDONALD, Judge, presiding.

ELIJAH N. ZOLINE, for appellant:

Each stockholder, whether by himself or proxy, must be free to cast his vote for what he deems the best interest of the corporation, the other stockholders being entitled to the benefit of such free exercise of his judgment. *Harvey v. Improvement Co.* 118 N. C. 693.

Any combination or device by which any number of stockholders shall combine to place the voting of their shares in the irrevocable power of another is contrary to public policy. *Cone* v. *Russell,* 48 N. J. Eq. 209.

A voting trust created by a re-organization committee on a blank consent of the stockholders, to endure for fifty years, and giving the trustee absolute power to vote the shares as it saw fit, and revocable only by three-fourths of such pooling stockholders, is void and against public policy. *Warren* v. *Pim,* 65 N. J. Eq. 353.

A trust agreement by which stockholders surrendered the power to vote and agreed that their stock should be voted, as contracted, by a person having no beneficial interest or title to the stock, preserving to themselves merely the

title and the right to dividends, is void as against public policy. *Shepaug Voting Trust cases,* 60 Conn. 553.

A pooling agreement by which stockholders transfer their shares of stock to trustees, to be voted as directed by holders of the majority thereof, for a period of five years, unless the holders of two-thirds of such stock vote to put an end to the trust sooner, is contrary to public policy. *Harvey* v. *Improvement Co.* 118 N. C. 693.

In a great many of the States voting trust agreements which delegate the voting power of stock to be pooled with others are absolutely void, even if the object be to control but one corporation. There is greater reason for holding such an agreement invalid where the effect of it is to consolidate several corporations,—and especially so when the corporations are public service corporations,—without a compliance with the laws of the State. *Harvey* v. *Improvement Co.* 118 N. C. 693; *Cone* v. *Russell,* 48 N. J. Eq. 208; *Warren* v. *Pim,* 66 id. 353; *Shepaug Voting Trust cases,* 60 Conn. 553; *Clark* v. *Railroad Co.* 50 Fed. Rep. 343; *State* v. *Newman,* 51 La. Ann. 833; *State* v. *Railroad Co.* 45 S. C. 470; *State* v. *Oil Co.* 49 Ohio St. 138; *People* v. *Sugar Refining Co.* 121 N. Y. 582.

A consolidation of the lines of transportation companies of the city of New York through the purchase and control of stock was held illegal and was enjoined at the instance of a single stockholder. *Burrows* v. *Interborough Co.* 156 Fed. Rep. 389; *Securities Co.* v. *Interborough Co.* 165 id. 945.

The voting trust agreement here involved vests the control and ownership of the Chicago City Railway Company and the four other public service corporations in the Chicago City and Connecting Railways Collateral Trust,—a nonentity and a body unknown to the law. A practical consolidation or merger of the five street railway lines has thus been effected by indirection without complying with the statute. *People* v. *Gas Co.* 254 Ill. 395; *Traction Co.*

v. *Chicago,* 199 id. 579; *Railway Co.* v. *Ashling,* 160 id. 373; *Railway Co.* v. *Jarvis,* 92 Fed. Rep. 735; *Securities Co.* v. *State,* 44 So. Rep. 785; *George* v. *Railroad Co.* 101 Ala. 607; *State* v. *Oil Co.* 49 Ohio St. 137; *People* v. *Sugar Refining Co.* 121 N. Y. 582; 2 L. R. A. 33; *People* v. *Gas Trust Co.* 130 Ill. 268.

It is the policy of the law that each corporation should perform its corporate functions through its own stockholders, who shall freely vote at corporate meetings, and transact business through its own officers. *Duke* v. *Markham,* 105 N. C. 135; *Durkee* v. *People,* 155 Ill. 354.

The public policy of our State restricts the management and direction of a railroad corporation to its stockholders and directors and does not brook the interference of outsiders. Hurd's Stat. chap. 114, sec. 8; *Durkee* v. *People,* 155 Ill. 354.

The trust agreement in question here places the control of five transportation companies in the hands of trustees who are completely controlled by the governing committee, and who are in turn elected by the holders of participation certificates of five corporations. It is submitted that this is "outside control" of a corporation, within the meaning of the law, and violates section 11 of article 11 of the constitution and is against the public policy of this State. *Durkee* v. *People,* 155 Ill. 354.

The voting trust agreement is invalid because it creates an illegal co-partnership, in that the original holders of the shares of stock having surrendered their holdings and taken in exchange participation certificates in five different public service corporations, became entitled to share in all of them. *Williams* v. *Johnson,* 208 Mass. 544; *People* v. *Railroad Co.* 121 N. Y. 583; *State* v. *Oil Co.* 49 Ohio St. 137.

An agreement to surrender shares of stock in different companies to trustees, who will elect directors and control

companies in the, interest of the trust, is illegal. *State* v. *Oil Co.* 49 Ohio St. 138.

There can be no legal consolidation without authority of statute. *Trust Co.* v. *Railroad Co.* 157 Ill. 641.

Corporations cannot consolidate without statutory authority, and the legislature, in granting such authority, may impose such terms as it sees fit. *Coil Co.* v. *Rose,* 242 Ill. 484.

A consolidation without express authority of charter or statute is *ultra vires* and cannot be done by indirection. Cook on Stock and Stockholders, (3d ed.) sec. 892.

JOHN P. WILSON, JOHN M. ZANE, and LEONARD A. BUSBY, for appellees:

The Chicago City and Connecting Railways Trust is an investment trust as, distinguished from a voting trust. Cook on Corp. (6th ed.) 622*h.*

Investment trusts or syndicates or unincorporated stock associations for acquiring and holding property, real or personal, including stocks and bonds, are not unlawful unless formed for an illegal purpose. Cook on Corp. (6th ed.) sec. 622*h.*

In *Phillips* v. *Blatchford,* 137 Mass. 510, it was said: "It is too late to contend that partnerships with transferable shares are illegal in this commonwealth. They have been recognized as lawful by the courts from *Alvord* v. *Smith,* 5 Pick. 232, to *Gleason* v. *McKay,* 134 Mass. 419. Even if the question were a new one we should come to the same result. The grounds upon which they were formerly said to be illegal in England, apart from statute, have been abandoned in modern times." To the same effect are *Hossack* v. *Development Ass'n,* 244 Ill. 274; *McDowell* v. *Joyce,* 149 id. 124; *People* v. *Rose,* 219 id. 46; *Wadsworth* v. *Duncan,* 164 id. 360; *Milligan* v. *Mackinlay,* 209 id. 358; *Hart* v. *Seymour,* 178 id. 598; *Robbins* v. *Butler,* 24 id. 387; *Smith* v. *Anderson,* L. R. 15 Ch. Div. 247.

Whether the syndicate agreement before the court is considered as being, in law, a partnership or strictly a trust, the stock being held by trustees for *cestuis que trustent,* it is legal and valid unless it was formed to accomplish an illegal end.  Cook on Corp. (6th ed.) sec. 622*h.*

The law does not prohibit or avoid trusts as to personal property except in reference to the suspension of ownership, and they may be created for any purpose not forbidden by law.  *Power* v. *Cassidy,* 79 N. Y. 602.

In the absence of statutory prohibition, express trusts of personal property may be created for any purpose.  *Gott* v. *Cook,* 7 Paige, 521; 1 Perry on Trusts, sec. 67.

The Chicago City and Connecting Railways Trust was not formed to accomplish an illegal purpose, nor does it directly or indirectly violate either the public policy or the laws of the State of Illinois.  None of the street railway lines owned by the companies whose stocks and bonds are the subject matter of the trust were competing lines at the date of the creation of the trust, and neither the ownership nor operation of either of these street railway systems was altered or affected in any way by the creation of the investment syndicate now before the court.  The legality of the operating agreements under which the street railway systems were being operated prior to the date of the trust agreement, and under which they are still operated, is not questioned.  These operating agreements were authorized by act of 1855.  3 Starr & Cur. Stat. par. 53, p. 3247.

The act of 1855 applies to street railroad companies. (*Chicago* v. *Evans,* 24 Ill. 52.)  It gives power to lease and make contracts for the operation of other railways. (*Railway Co.* v. *People,* 84 Ill. 426.)  It authorizes a company to acquire the right of passage over the tracks of another company. (*Railway Co.* v. *Railroad Co.* 149 Ill. 272.)  It authorizes a company to acquire the right to operate over the road of another company in another State. *Railroad Co.* v. *Railway Co.* 118 U. S. 290.

The owners of a majority of the stock of a corporation have a right to contract with each other that their stock shall be voted as a unit, and in that way to control the election of the officers and the management of the corporation. *Faulds* v. *Yates,* 57 Ill. 416; *Higgins* v. *Lansingh,* 154 id. 355; *Kantzler* v. *Bensinger,* 214 id. 598; *Smith* v. *Railway Co.* 47 Pac. Rep. 582; Beach on Corp. sec. 304.

The fact that the legal title to the different stocks is in a trustee is no objection to the trustee voting upon the stocks of any one of the corporations. *Clarke* v. *Railroad Co.* 62 Fed. Rep. 328.

Even a voting trust, as such, is not illegal unless the purpose or object of its creation is the accomplishment of an illegal end. Cook on Corp. (7th ed.) sec. 622*f*.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

The appellant, as a stockholder of the Chicago City Railway Company, filed a bill and a supplemental bill in the superior court of Cook county, in behalf of himself and all other stockholders similarly situated, for the purpose of having declared illegal and void a certain agreement creating a trust known as the Chicago City and Connecting Railways Collateral Trust, of enjoining the transfer, holding or voting by the trustees of said trust of any shares of stock in the Chicago City Railway Company or the performance of any other act in pursuance of the said agreement; of enjoining the combining, merging, consolidating or uniting of the property, franchises, earnings, capital stock or management of the Chicago City Railway Company with those of other defendant corporations, or any of them, or with those of the elevated railroads in the city of Chicago. Answers were filed, the cause was heard on the pleadings and evidence, a decree was rendered dismissing the bill for want of equity, and the complainant appealed.

The defendants to the bill were the Chicago City Railway Company and its directors, four other street railway companies, viz., the Calumet and South Chicago Railway Company, the Hammond, Whiting and East Chicago Electric Railway Company, the Southern Street Railway Company and the Chicago and Western Railway Company, Ira M. Cobe, John W. McKinnon, the firm of J. P. Morgan & Co., the trustees and members of the committee named in the trust agreement, and others.

The Chicago City Railway Company was organized in 1859 under a special act of the General Assembly of the State of Illinois, with power to maintain and operate a railway in the streets of the south and west divisions of the city of Chicago on such terms and conditions as the city council might prescribe. Its rights in the west division were afterward, in pursuance of legislative authority, transferred to the Chicago West Division Railway Company, and by a later act the term of its existence was extended to ninety-nine years from February 4, 1859. Prior to 1907, under ordinances of the city, it had constructed various lines of railway in the streets of the south division of the city and was operating them. The Calumet and South Chicago Railway Company, the Southern Street Railway Company and the Chicago and Western Railway Company are all Illinois corporations organized under the general Incorporation act, owning street railways in the south division of the city of Chicago, which they, respectively, operated prior to the passage of the ordinance and the making of the operating agreements hereafter mentioned. The Hammond, Whiting and East Chicago Electric Railway Company is an Indiana corporation, having certain lines of street railway in the State of Indiana which it operated and which connected at the State line with the lines of the Calumet and South Chicago Railway Company. The lines of all these street railway companies, except the Indiana company, connected at various points with the lines of the Chicago City

Railway Company, and none of them had access to the business center of the city of Chicago except over the lines of the latter company. This was the situation when, on February 11, 1907, the city adopted an ordinance authorizing the Chicago City Railway Company to construct, maintain and operate a system of street railways in the streets of Chicago. The validity of this ordinance was sustained in *Venner* v. *Chicago City Railway Co.* 236 Ill. 349. It declared the purpose and desire of the city to provide for the unified operation and the comprehensive re-construction of all the street railways within the city, established certain through routes to be operated by the Chicago City Railway Company in co-operation with other corporations operating street railways within the city, provided for the establishment and operation of other through routes and the making of operating agreements for such purposes, and required the exchange of transfers with all existing street car lines in the city after such time as the several franchises of such existing lines should have expired and should have been extended or renewed.

After the passage of this ordinance and its acceptance by the Chicago City Railway Company the city passed another ordinance on March 30, 1908, authorizing the Calumet and South Chicago Railway Company to construct, maintain and operate a system of street railways in streets and public ways of the city of Chicago, whereby that company was required to enter into a reasonable operating agreement with the Chicago City Railway Company on terms to be agreed upon by the two companies, subject to the approval of the city's board of supervising engineers, whereby the Chicago City Railway Company should be authorized and required to operate the street railway of the Calumet and South Chicago Railway Company in compliance with the requirements of that ordinance. Accordingly such an operating agreement was entered into and was consented to by the city council, under which the Chicago City

Railway Company has since been operating the street railway system of the Calumet and South Chicago Railway Company. Before this operating agreement was entered into the Calumet and South Chicago Railway Company had entered into certain contracts with the Hammond, Whiting and East Chicago Electric Railway Company pertaining to the operation of the latter company's lines, the terms of which contracts the Chicago City Railway Company undertook, by its operating agreement, to perform.

On March 15, 1909, the city passed an ordinance authorizing the Southern Street Railway Company to construct, maintain and operate a system of street railways in streets and public ways of the city of Chicago, requiring that company to enter into an operating agreement with the Chicago City Railway Company, whereby the latter company should take over, for the purposes of operation and rehabilitation, all of the street railways of the Southern Street Railway Company, subject to the provisions of the ordinance to the same extent as though the Chicago City Railway Company had been named in the ordinance as the original grantee. Thereupon, on April 1, 1909, an operating agreement was entered into, whereby the Chicago City Railway Company agreed to operate, as an integral part of its system, the street railway system of the Southern Street Railway Company in compliance with the ordinance of March 15, 1909, and it has since that time been in possession of and operating such street railway system.

The Chicago and Western Railway Company had entered into an agreement with the Chicago City Railway Company in 1903 for the interchange and transfer of passengers, whereby the latter company agreed to furnish power, motormen and conductors to run the cars of the former company, and the lines of the Chicago and Western Railway Company were thereafter operated in compliance with this agreement.

The bill was filed on January 22, 1910, and the trust agreement which constitutes the cause of complaint bears date January 1, 1910. At the latter date all the ordinances and agreements which have been mentioned were in force and the Chicago City Railway Company was in possession of all the lines of railway of all the corporations named and was operating them in compliance with the terms of the several ordinances and agreements. J. P. Morgan & Co. had been in control of a majority of the stock of the Chicago City Railway Company since before the passage of the ordinance of February 11, 1907. The number of the shares of capital stock of the various corporations, and their par value, were as follows: Chicago City Railway Company, 180,000 shares, $18,000,000, par value; Calumet and South Chicago Railway Company, 50,000 shares, $5,000,-000, par value; Southern Street Railway Company, 8000 shares, $800,000, par value; Hammond, Whiting and East Chicago Railway Company, 10,000 shares, $1,000,000, par value; Chicago and Western Railway Company, 720 shares, $72,000, par value. On January 1, 1910, Ira M. Cobe and John W. McKinnon held all of this stock, except 10,281 shares of the Chicago City Railway Company, together with $7,674,000 of the bonds of the corporations except the Chicago City Railway Company. By a written agreement they assigned all these shares of stock and bonds to Elbert H. Gary, Albert J. Earling and Samuel M. Felton as trustees, and it is this agreement which the bill attacks. The trust was designated the Chicago City and Connecting Railways Collateral Trust. The stock and bonds were to be held by the trustees and their successors, with all the rights and powers of stockholders or bondholders, with full power of sale or other disposition of all or any part thereof during the lives of eight persons named and during the life of the survivor and twenty years after, unless the trust should be sooner terminated. The trustees were to issue $22,000,-000 of five per cent bonds, payable only out of the principal

and income of the trust fund, and to execute a collateral trust indenture with the First Trust and Savings Bank of Chicago, to which all the stock and bonds constituting the trust fund were to be assigned in trust to secure the payment of the five per cent bonds, which were then to be certified by the bank. Subject to the obligation of the five per cent bonds, the beneficial interest in the trust fund was to be in the holders of the preferred and common participation shares, of which 250,000 and 150,000, respectively, transferable but having no stated value, were to be issued. Provision was made for the division of the net income from the fund and the final division of the principal among the participation shareholders and for an increase of the number of common participation shares under certain circumstances. The details of these provisions are not material to a consideration of the questions arising. It is provided that, "subject to the provisions of the indenture securing the five per cent bonds, the trustees shall have the right to vote on any and all shares of stock constituting any part of the trust fund, at any and all meetings, regular or special, of the corporation or corporations issuing such stocks, and, subject to the terms and provisions of this trust agreement, the trustees may take any action or may give or execute any consent or may take any step which the owners of such stock would be entitled or authorized to take, give or execute, with the same force and effect as though at the time the trustees were the absolute owners of such stock; and from time to time the trustees may give proxies to any person or persons to vote such stock, but in voting upon any of said stock the trustees shall follow the directions or instructions, if any, that may be given to the trustees by the committee, and shall cause their proxies also to follow such directions or instructions. The trustees and the committee assume no personal responsibility respecting the voting of said stock or in the management thereof or in respect of any action taken by them as such stockholders." The trus-

tees are also authorized to transfer to any person any shares of stock in any company whose securities constitute a part of the trust fund, in order to qualify such person as a director or officer of such company or for the purpose of maintaining the organization of the company; to permit to be sold or leased to, or merged or consolidated with each other, any corporations or companies any of whose shares, bonds or securities constitute any part of the trust fund, and "to vote upon any of the shares constituting any part of the deposited securities, in favor of any lawful consolidation, merger or re-organization of the properties, franchises or shares of any of the companies whose shares, or part thereof, shall constitute part of said trust fund, with the properties, franchises and shares of any other company," etc.

A committee was constituted having power to bind the holders of every participation share as fully as if each such holder had expressly authorized or assented to each act or proceeding, to manage and control the trusts, to ascertain and determine the income, apportion and direct the payment on the participation shares, as dividends, of any money or property applicable to such purpose, and generally to exercise such powers as should be required for the proper administration of the trust. The original committee, consisting of eight persons, was named, but the election of the committee subsequently by the shareholders was provided for, and it was provided that a member of the committee need not be a shareholder. The committee was given power to increase or decrease the number of trustees and to discharge any trustee. Annual meetings of the shareholders were provided for, at which the participation certificateholders were authorized to cast a vote for each participation share held. By the resolution of a majority of the shares any trustee might be removed and the trustees directed to terminate the trust. The trust might also be terminated by the request of a majority of the members of the committee and the First Trust and Savings Bank, and it should be

terminated by the purchase of the property of the Chicago City Railway Company by the city of Chicago, pursuant to the ordinance of February 11, 1907. No holder of any bond, participation certificate or other security could terminate the trust or require any distribution of any of the securities other than in accordance with the terms of the agreement, and the death of any trustee, participation certificateholder or committee member should not operate to terminate the trust, and the legal representatives of such a decedent should not terminate the trust or have a right to require an accounting.

The appellant is the owner of 200 shares of the capital stock of the Chicago City Railway Company. His first objection to the trust agreement is, that by it the stockholders of the Chicago City Railway Company have irrevocably deprived themselves of their deliberative powers and duties as stockholders, divested themselves of all control of the corporation and placed its management in the hands of strangers. After the transfer of the securities by Cobe and McKinnon to the trustees the beneficial ownership of the stock was represented by the participation certificates. Each holder of a participation certificate was a beneficial owner of the 169,719 shares of the stock of the Chicago City Railway Company in proportion to the number of his participation shares, and was also the beneficial owner of the stock of the other companies in the same proportion. Disregarding the other companies for the present, the effect of the transfer was to place the legal title of the majority of the stock of the Chicago City Railway Company in the trustees, together with the voting power, which was thus separated from the beneficial ownership existing in the holders of the participation certificates but was to be exercised in accordance with the latters' wishes, as expressed by a committee chosen by them for this purpose. Such a trust is not necessarily illegal. Ordinarily, men may make any disposition of their property they see fit, and they may therefore create

a trust in their personal property for any purpose they deem best, so long as the purpose is not prohibited by statute or some rule of public policy. There is no statute of this State which prohibits a trust of the stock of a corporation for the purpose of controlling its management. There is no rule of public policy in this State which prohibits the combination of the owners of a majority of the stock of a corporation for the purpose of controlling the corporation. On the contrary, it has been expressly held that a contract by the owners of more than one-half of the shares of stock of a corporation to elect the directors of the corporation so as to secure the management of its property, to ballot among themselves for directors and officers if they could not agree, to cast their vote as a unit as the majority should decide so as to control the election, and not to buy or sell stock except for their joint benefit, is not dishonest, violative of the rights of others or in contravention of public policy. (*Faulds* v. *Yates*, 57 Ill. 416.) This case has been sustained by later decisions of this court, (*Higgins* v. *Lansingh*, 154 Ill. 301; *Kantzler* v. *Bensinger*, 214 id. 589;) has been approved by the decisions of the courts of other States, (*Brightman* v. *Bates*, 175 Mass. 105; *Smith* v. *San Francisco and North Pacific Railway Co*. 115 Cal. 584;) has been cited by text writers announcing the law as therein stated, (Purdy's Beach on Private Corp. sec. 704a,) and we regard the decision as sound in principle.

"It is as legitimate for a majority of stockholders to combine as for other people. The fact that they expect 'gain and advantage' * * * to accrue to them does not make the combination unlawful. That expectation and intent would have that effect only if the gain was to be at the expense of the corporation or in some way was intended to work a wrong on the other stockholders. * * * If stockholders want to make their power felt they must unite. There is no reason why a majority should not agree to keep together." *Brightman* v. *Bates, supra.*

The stockholders can control the affairs of a corporation only through the election of directors, and at every such election there is necessarily a combination of shares upon the persons elected. Such combination may be made at the time of the meeting, but there is no reason why stockholders may not agree beforehand to vote for certain persons as directors, and often they must do so in order to elect the persons desired. There is nothing in the law to prevent the owners of a majority of the stock from giving proxies to the same person. Unless restricted by its terms or by some statutory provision a proxy confers on the grantee a discretion, unlimited either in character or duration, until revoked. A majority of the stockholders may therefore, by uniting in the same proxy, confer upon an agent unlimited discretion to vote their stock, and there is no policy of the law to prevent their transferring the stock to a trustee with the like unrestricted power. It is the purpose for which the trust was created which must determine its legality. Besides those already cited, it has been decided in the following cases, among others, that the pooling of stock by the owners for the purpose of electing directors and officers and controlling the management and business of the corporation was not against public policy so long as no fraud was committed or wrong done to the other stockholders: *Ohio and Mississippi Railroad Co.* v. *State,* 49 Ohio St. 668; *Griffith* v. *Jewett,* 9 Ohio Dec. (Re-print) 627; *Weber* v. *Della Mountain Mining Co.* 14 Idaho, 404; *Mobile and Ohio Railway Co.* v. *Nichols,* 98 Ala. 92; *Hey* v. *Dolphin,* 92 Hun, 230; *Havemeyer* v. *Havemeyer,* 43 Super. Ct. (N. Y.) 506; *Brown* v. *Pacific Mail Steamship Co.* 5 Blatchf. 525. On the other hand, an agreement is invalid whose object is not the benefit of all the stockholders equally but is some unfair advantage to the parties to it, only, as where one of the parties is to have a certain office at a certain salary, or the parties to the agreement are to receive the profits to be made out of certain contracts to

be entered into by the management under their direction, or the stock of the corporation is to be voted or its affairs managed by the determination of persons other than its stockholders or by a minority of its own stockholders. (*Guernsey* v. *Cook,* 120 Mass. 501; *Shepaug Voting Trust cases,* 60 Conn. 553; *Kreissl* v. *Distilling Co. of America,* 61 N. J. Eq. 50; *Cone* v. *Russell,* 48 id. 208; *White* v. *Thomas Inflatable Tire Co.* 52 id. 178; *Morel* v. *Hoge,* 130 Ga. 625; *Hafer* v. *New York, Lake Erie and Western Railroad Co.* 9 Ohio Dec. [Re-print] 470.) Many of the cases relied upon by counsel for the appellant are of this character, and were founded on the principle that the owners of a majority of the stock have no right to use their power to advance their own private interests at the expense of the minority. In others the complaints were made by parties to the agreement or purchasers from parties to the agreement, claiming that the agreement was not binding upon them but was revocable at their pleasure. Cases of this kind are not in point, for the appellant is not a party to the trust agreement and cannot complain of its terms unless his rights as a stockholder have been injuriously affected by it or will necessarily be injuriously affected.

It is not correct to say that by this agreement the stockholders have deprived themselves of their deliberative powers or divested themselves of all control of the corporation. The management of the corporation is in the hands of its directors, elected annually. This election by the trustees according to the direction of the committee selected by the participation shareholders, who are the beneficial owners of the stock, is really an election by the stockholders through their proxies,—that is, their agents empowered to act for them. These shareholders clearly have the right to agree, at every annual election, to have the vote of all the shares cast as the committee then selected may determine. Whether the agreement binds all the shareholders so that they cannot withdraw from it is a question which does not concern the

appellant.   So long as the shareholders are satisfied and continue to act in accordance with it no one else has any right to complain.   So far as this question is concerned, the fact that the shareholders, besides owning 169,719 shares of the stock of the Chicago City Railway Company, also own the whole stock of the other corporations, is immaterial. The appellant is interested only in the Chicago City Railway Company, and so long as that company is managed in a lawful manner, with all due regard to his interests as a stockholder in it, he has no cause of complaint.

If the trust agreement had concerned only the stock of the Chicago City Railway Company the appellant would have had no legal ground of complaint, because the participation shareholders, being the owners of the majority of the stock, had the right to control the election of directors and officers and the management of the business through their committee selected by themselves.   The appellant contends, however, that the trust agreement placed the management and control of the corporation in the hands of outsiders,—that is, a committee selected by the holders of participation certificates and not by the stockholders of the corporation.   The holders of the participation certificates are, however, the beneficial owners of the stock.   The fact that they also own, jointly, by the same title and in the same proportions, all the stock of the other corporations, does not, of itself, necessarily affect their relation to the Chicago City Railway Company.   If the affairs of that company are honestly and fairly conducted by its board of directors selected by its own stockholders with due regard to the equal interest of all the stockholders, it furnishes no cause of complaint to the appellant that the majority stockholders are owners, also, of other corporations engaged in a similar or dissimilar business, or that they have committed the management of such other corporations to boards of directors composed of the same persons as the board of directors of the Chicago City Railway Company.   The com-

mon ownership of the stock of the several corporations is not in violation of any law, and under the facts in the case imposes no liability or disability upon the owners which they were not under when holding the stock severally.

It is insisted that the trust agreement has practically effected a consolidation of the five street railway corporations by indirection, without a compliance with the statute and in violation of the constitution. No attempt at a legal consolidation of the corporations has been made. In spite of the common ownership of their stock the companies remain separate corporations. There has been no merger of their property, and while all the lines are operated by the Chicago City Railway Company, they are so operated by virtue of contracts which fix the manner of operation, the manner of accounting and the amount and time of payment by and to each company. There is no union of property, of funds or of earnings, no joint profit-and-loss account, nor any consolidation except such as may be supposed to arise from the common ownership of the stock. There is unity of ownership and of management. If the consolidation of these street railway companies were prohibited by the constitution or by statute, or if the effect of the agreement among their stockholders were to destroy competition to the public injury, this trust agreement would be unlawful. Combinations and associations of corporations or of individuals by which the control of competing corporations is vested in a single ownership, with the effect of destroying competition, limiting production, enhancing prices or monopolizing business, are unlawful. They are manifestly injurious to the public and their illegal purpose subjects them to the condemnation of the law.

It is claimed that the above principle applies to the present case because the corporations concerned are subject to the prohibition contained in section 11 of article 11 of the constitution against the consolidation by any railroad corporation of its stock, property or franchises with any other

railroad corporation owning a parallel or competing line. In our judgment this section has no application to street railways but refers to commercial railroads carrying freight and passenger traffic. It is true that the language is broad enough to cover street railways, and the same words used in the act to enable railroad companies to enter into operative contracts, adopted in 1855, before the adoption of the present constitution, (Hurd's Stat. 1911, par. 44, p. 1820,) were held to include street railways, (*City of Chicago* v. *Evans,* 24 Ill. 52,) but a consideration of all the provisions contained in that article of the constitution, together with the legislative construction of its meaning, leads us to the conclusion that the constitutional convention did not have street railways in mind in the adoption of this section. The article is headed "corporations," and the first three sections are devoted to corporations generally. The fourth section concerns street railways only, and prohibits the legislature from granting the right to construct or operate a street railroad within any city, town or incorporated village without the consent of the local authorities. Sections 5 to 8, both inclusive, are placed under the heading "banks" and deal exclusively with banks. The remainder of the article,—sections 9 to 15, both inclusive,—deals with railroads under that heading. Section 9 requires certain things of every railroad corporation, among them a sworn annual report by the directors, and imposes upon the General Assembly the duty of passing laws to enforce the provisions of the section. The legislature, immediately after the adoption of the constitution, passed a law providing for the incorporation of railroad companies and containing provisions for the enforcement of the requirements of section 9 of article 11 of the constitution, as that section required them to do. This act did not authorize the organization of street railway companies, but the legislature at the same session passed the general Incorporation act, under which street railways were expressly authorized to be organized. The

act, however, contained no provision for enforcing the requirements of section 9, and it is evident that this first legislature under the constitution, in passing these two acts, understood the requirements of section 9 in regard to "railroad corporations" to apply to ordinary commercial steam railroads and not to the relatively unimportant street railways, whose motive power then was horses or mules. The same view of a like provision of the constitution of Pennsylvania was taken by the Supreme Court of that State in *Gyger* v. *Philadelphia City Passenger Railway Co.* 136 Pa. 96. This constitutional prohibition did not forbid the consolidation of the street railway corporations involved here.

If the companies, or some of them, were competitors and their union had a tendency to eliminate competition and to reduce the service to the injury or inconvenience or at the expense of the public, such union, even in the absence of a constitutional or statutory prohibition, would be in violation of public policy, and it was so held in the case of *South Chicago City Railway Co.* v. *Calumet Electric Street Railway Co.* 171 Ill. 391. That case is cited as holding that the two street railway companies there litigating, which are said to have since become consolidated as the Calumet and South Chicago Railway Company, were doing a competitive business, and that whatever tends to prevent competition between them and create a monopoly in their hands is against public policy. That case was decided in 1898, many years before the ordinance of February 11, 1907, was passed. It referred to conditions then existing. At that time several street railways were occupying the streets in the south division of Chicago with railway lines which they were operating independently, under various ordinances granting this privilege. It might be said, with reason, that two such companies serving the same general territory under such conditions were competitors for business, and that public policy would not permit them to unite the separate privileges which the city had granted, so as to restrict their

258 — 35

competition. The condition now, however, is altogether different. The constitution commits to the city the control of the operation of sreet railways in its streets. It is for the city to determine whether such operation shall be competitive or monopolistic; to grant the privilege to many or confine it to one. By the ordinance of February 11, 1907, with its expressed intention to provide for the unified operation of all of the street railways within the city, and the subsequent ordinances extending or renewing the privileges of existing companies and requiring such companies to enter into agreements with the Chicago City Railway Company for the operation of their street railway lines, the city has expressed its policy to do away with diversity of control and operation of street railways. The city council has the authority to declare the public policy in regard to the operation of street railways within the city, and the effect of its declaration is the abandonment of the principle of competition between such railways. The combination, union or merger of two or more street railway companies in the city of Chicago for the joint operation of their lines under a single management is not now against public policy, but is in accordance with the declared purpose and desire of the city in regard to street railways.

In *Union Trust and Savings Bank* v. *Kinloch Long Distance Telephone Co.* (*ante,* p. 202,) we cited *South Chicago City Railway Co.* v. *Calumet Street Railway Co. supra,* to the proposition that the union of competing corporations engaged in a public service in which all the public are interested, having a tendency to eliminate competition and reduce the service to the injury or inconvenience or at the expense of the public, is contrary to the public policy of the State. We further held in that case that it is a legislative question whether the public interest will be promoted by monopolistic rather than competitive service, and the legislature has power to change this policy. So far as street railways are concerned, that question is under the control of the city

council, and the council having determined upon a policy of the single operation and control of street railways, the case cited is no longer applicable to such a condition.

The provision of the trust agreement which authorizes the trustees to transfer shares to any person to qualify him as a director or for the purpose of maintaining the organization of the company is attacked as being inconsistent with the charter of the Chicago City Railway Company, which requires its directors to be stockholders, and as showing conclusively that the original corporations maintain a formal organization, only. Mr. Busby, the president of the Chicago City Railway Company, testified that some shares of that company's stock were transferred to him to qualify him as a director and the stock was really owned by the trustees of the Chicago City and Connecting Railways Collateral Trust. If the transfer of stock to a person for the sole purpose of qualifying him as a director be regarded as violative of the rights of stockholders of the Chicago City Railway Company and of its charter, this provision would not vitiate the whole trust agreement. At the utmost it could only result in the disregard of the provision itself. The trustees might never make any transfers of shares for the purpose of qualifying a director and might lawfully carry out all the terms of the trust agreement without doing so. This provision is not an essential part of the trust agreement. The transfer to Mr. Busby is not shown to have been in violation of the charter of the Chicago City Railway Company, for it does not appear that he was not the holder of participation shares, and if so, he was already the beneficial owner of stock and the transfer only conveyed to him a legal title.

It is insisted that the trust is unlawful because of its assumption of the name "Chicago City and Connecting Railways Collateral Trust," which, it is said, is a fictitious corporate name, the assumption of which is a violation of section 220 of the Criminal Code, and also subjects the ap-

pellees to a civil liability under section 18 of the Incorporation act. The assumption of fact on which this claim is based is unfounded. The name does not imply a corporation. A trust does not imply a corporation, for it may or may not be incorporated.

It is argued that the operating agreements were invalid and the charter of the Chicago City Railway Company has been violated because by the establishment of the through routes by the ordinance of February 11, 1907, that company was compelled to operate its cars in divisions of the city in which it was not authorized by its charter to construct or operate street railways, and because it operates in Indiana the line of the Hammond, Whiting and East Chicago Electric Railway Company, an Indiana corporation. These operating agreements with street railways, not only in other divisions of the city than the south division but also in Cook county outside of the city and in the State of Indiana, were entered into under the authority of the act of 1855, which has already been referred to. (Hurd's Stat. 1911, par. 44, p. 1820.) This act authorizes the leasing of other railroads and the making of contracts for their operation, (*Illinois Midland Railroad Co.* v. *People,* 84 Ill. 426,) and the acquisition of the right to operate over the road of another company in another State. (*Pennsylvania Railroad Co.* v. *St. Louis, Alton and Terre Haute Railway Co.* 118 U. S. 290.) The appellant argues that this act, which was passed prior to the constitution of 1870, does not authorize the operating agreements because inconsistent with section 11 of article 11 of the constitution, prohibiting the consolidation of parallel or competing lines, but we have held that this section does not apply to these street railway corporations.

The bill alleges that the plans of the defendants extend to a consolidation of the stock, franchises and property of the Chicago City Railway Company with various other public service corporations in the city of Chicago and its vicin-

ity, whereby all the elevated and surface street railway lines in the city and its vicinity, whether they are doing a competitive business or not, shall be consolidated, merged or combined under one control and ownership, and the prayer includes an injunction against such consolidation, combination or merger. It is claimed by appellant that the elevated railroads and the street railways are railroad corporations owning parallel and competing lines, whose consolidation is prohibited by section 11 of article 11 of the constitution, and that, since no consolidation can be constitutionally made, any acts attempting or intended to bring about a merger should be enjoined. The appellees deny that the constitutional prohibition applies but they concede that the statute does not authorize the consolidation of the street railways with the elevated roads, and that such consolidation cannot take place without an enabling act of the legislature as well as an ordinance of the city. It appears from the record that the local transportation committee of the city council has under consideration the question of merging, consolidating and combining the street railway lines with the elevated lines and has been trying to get a valuation of the various properties as the basis of an ordinance. All the surface and elevated roads joined in a statement to this committee, saying that with the ownership of the present lines vested in different companies, with interests competitive in certain localities and conflicting at times in matters of service, it is not possible to realize an ideal system of transportation, and that in order to obtain such a system it is necessary to have physical consolidation of the properties, if possible, and the operation of all the lines under a single franchise or under substantially identical franchises and with single ownership or control. The north and west side lines are together in one system, the Chicago City and Connecting Railways Collateral Trust controls the south side lines, and ninety-eight per cent of the stocks of the elevated lines is in a trust, with an option for its purchase by those

interested in the surface lines. It is the desire of the owners of the elevated lines and the surface lines to merge and operate, jointly, all the surface and elevated railways in the city. Such a merger cannot be effected without the consent of the city through the passage of an ordinance. Such an ordinance may not be passed. The constitution prohibits the consolidation of railroad corporations owning parallel or competing lines, and the statute authorizes the consolidation only of corporations of the same kind. The elevated railroad companies are organized under the Railroad and Warehouse act, the surface companies under the general Incorporation act, except the Chicago City Railway Company, which is organized under a special act. The appellees' answer avers that it has been wholly impracticable to consider or attempt to formulate any plan for unified operation or universal transfers until the city council has adopted some plan and proposed the same, by ordinance or otherwise, and that they have not attempted to formulate any plan for merging, consolidating or combining such transportation companies. It is admitted that the defendants desire to bring about a merger or consolidation of all the street railways and elevated roads in Chicago. It is not shown that they have attempted, or intend attempting, anything contrary to law. Counsel for the appellant says in his brief that the idea of getting legislative sanction for the merger is an afterthought and that the plan the promoters have in mind is a voting trust. The record does not sustain this statement and it is denied by the appellees. While anticipated unlawful acts of the directors of a corporation may furnish ground for an injunction, fear, alone, of such illegal action is not sufficient. There must be something more than the possibility of illegal action,—something more than mere apprehension. The act to be enjoined must be one the doing of which is actually threatened and may be expected with reasonable certainty if not enjoined. The negotiation between the local transportation committee of

the city council and the local transportation corporations has not yet reached a stage where any definite plan has been evolved. Whether any plan ever will be adopted is uncertain. Until some scheme has been determined upon, the possibility of injury to the appellant or of unlawful action on the part of the appellees is too remote to justify an injunction. The appellees cannot be enjoined from thinking about a consolidation, from discussing the feasibility of it, from taking the opinion of counsel, or even from endeavoring to obtain legislation to authorize it. There is no immediate unlawful action imminent or threatened and no occasion for the present issuance of an injunction.

The superior court properly held that the bill was without equity, and its decree will be affirmed.

*Decree affirmed.*