GENERAL FINANCE CORPORATION et al. v. KEYSTONE CREDIT CORPORATION et al.

No. 3084.

Circuit Court of Appeals, Fourth Circuit.

June 17, 1931.

A. W. Patterson and M. J. Fulton, both of Richmond, Va., for appellants and cross-appellees.

Hartwell Cabell, of New York City, and Murray M. McGuire, of Richmond, Va. (Cabell, Ignatius & Lown, of New York City, McGuire, Riely & Eggleston and Shewmake & Gary, all of Richmond, Va., M. B. Ignatius, of New York City, John S. Eggleston, Oscar L. Shewmake, and J. Vaughan Gary, all of Richmond, Va., on the brief), for appellees.

Joseph S. Clark, of Philadelphia, Pa. (Gerald F. Flood, of Philadelphia, Pa., Brockenbrough Lamb, of Richmond, Va., Clark, Clark, McCarthy & Wagner, of Philadelphia, Pa., and Christian & Lamb, of Richmond, Va., on the brief), for appellee and cross-appellant.

Before PARKER and NORTHCOTT, Circuit Judges, and GLENN, District Judge.

874

PARKER, Circuit Judge.

For some time prior to the year 1926, the National Credit Corporation, hereafter called the National Company, and the Virginia Mortgage & Finance Corporation, hereafter called the Virginia Company, both being corporations organized under the laws of Virginia, were engaged, in the city of Richmond, in the business of discounting paper secured by mortgages and liens on automobiles. In that year the stockholders of these corporations entered into contracts with Hare & Chase, Inc., a corporation of Pennsylvania, under the terms of which they exchanged their holdings of stock for stock in Hare & Chase, these contracts being made upon the faith of certain statements of the officers of Hare & Chase as to the financial condition of that corporation. After the transfer of stock, the National and the Virginia Companies, whose stock was then owned by Hare & Chase, were kept alive as active corporations and were operated by officials chosen at corporate meetings controlled by Hare & Chase.

The stock of the National and Virginia Companies came into the possession of the Keystone Credit Corporation, hereafter called the Keystone Company, under the following circumstances: In January, 1927, it was discovered that the financial condition of Hare & Chase was very precarious as the result of investment in certain taxicab paper which had been discounted for a corporation of Indianapolis. A meeting was thereupon had between its officers and representatives of the Royal Indemnity Company, a corporation which had guaranteed the payment of paper which it had discounted and deposited under a trust agreement with the Equitable Trust Company to procure certificates used as a basis of credit. At this meeting was represented also the Royal Insurance Company of Liverpool, which owned the stock of the Royal Indemnity Company, and which, for the purpose of saving Hare & Chase from receivership, agreed through its representatives to advance to that corporation at once the sum of $1,000,000 and further sums later, as same should be needed. Hare & Chase on its part agreed to execute its notes for the sums so advanced and to assign as collateral thereto certain stocks and other securities, including the stock which it owned in the National and Virginia Companies. Pursuant to this contract, the advancements were made by the Royal Insurance Company, and notes were given evidencing same, and the securities agreed upon, including the stock of the National and Virginia Companies, were assigned to one Fortington, agent and financial representative of the Royal Insurance Company in the United States. Shortly thereafter he and other representatives of the Royal Insurance Company caused the Keystone Company to be organized under the laws of Pennsylvania, and transferred to it the notes of Hare & Chase executed for the advancements as well as the securities which had been delivered as collateral thereto, including the stock in the National and Virginia Companies.

Among the assets of the Virginia Company were certain notes amounting to about $115,000 secured by mortgages on personal property other than automobiles. After the transfer of the stock of that company to Hare & Chase, a Virginia corporation was organized under the name of the General Finance Corporation, hereafter referred to as the General Company, to take over this paper and handle same and paper of similar character. One S. R. Brame, who was made president of both the National and Virginia Companies after the transfer of their stock to Hare & Chase, was made president of the General Company also; and the $115,000 of paper of the Virginia Company was transferred to the General Company by him under circumstances hereafter more fully explained.

On May 2, 1927, suit was instituted against Hare & Chase in the law and equity court of Richmond, Va., by Brame and four other stockholders of the National Company, in behalf of themselves and other persons similarly situated, alleging that the exchange of stock between the National stockholders, on the one hand, and Hare & Chase, on the other, had been secured by fraudulent representations, and asking that the contract be rescinded and set aside, and that their rights in the National Company be restored to them. This suit was duly removed into the federal court by Hare & Chase, and, on June 13th following, that corporation, together with the Keystone Company, filed an independent suit in that court against the National, Virginia, and General Companies and S. R. Brame, alleging that Hare & Chase was the owner of the stock in the National and Virginia Companies, that same had been assigned to the Keystone Company, and that Brame was diverting the assets of both of these companies to the use and benefit of the General Company. The bill prayed that a receiver be appointed for all three companies, that an accounting be had, and that the usual incidental injunctions be granted.

The defendants in the suit last mentioned filed answer alleging that the stock of the National and Virginia Companies had been acquired by Hare & Chase through fraud, and that the Keystone Company had taken the assignment of the stock with actual or constructive knowledge thereof. They consented to the appointment of a receiver for the National and Virginia Companies, but asked damages by way of counterclaim for the destruction of the business of these companies by Hare & Chase. At the same time the stockholders of the Virginia Company filed an intervening petition setting up fraud on the part of Hare & Chase in acquiring their stock and asking that the exchange be rescinded and their stock returned to them. A receiver was thereupon appointed for the National and Virginia Companies and an order was entered consolidating the two suits for the purpose of joint hearing. Thereafter a compromise was entered into between the Virginia stockholders, on the one hand, and Hare & Chase and the Keystone Company on the other, by the terms of which all matters in difference between them were settled upon the agreement that 55 per cent. of the proceeds of the assets of the Virginia Company should be distributed among its former stockholders and the remaining 45 per cent. should go to Hare & Chase or the Keystone Company.

The consolidated causes were referred to a special master who heard much testimony and filed a number of reports with the court as to the matters in controversy. After considering these in the light of the evidence, the learned judge below held: (1) That there was fraud on the part of Hare & Chase in securing the stock of the National Company from its stockholders; (2) that rescission of the contract and return of the stock could not be decreed because the stock was held by the Keystone Company, which the court found to be a holder for value not affected with notice of the fraud; (3) that, not being able to grant rescission, the court would award damages to such of the National stockholders as were shown to have parted with their holdings in that company because of reliance upon the fraudulent representations of Hare & Chase; and (4) that the transfer of assets from the Virginia Company to the General Company was void and of no effect, and that such assets were to be treated as the property of the Virginia Company. The assignments of error challenge the jurisdiction of the court to entertain the claims of stockholders amounting to less than $3,000 and the correctness of the holdings of the trial court with respect to the matters enumerated. We shall consider, first, the jurisdictional question and then the other questions in the order named.

## The Question of Jurisdiction.

Neither the original bill of the National stockholders nor the amended and supplemental bill, filed after removal to the federal court, contained any allegation as to the amount in controversy. The petition for removal filed by Hare & Chase, however, alleged that the amount in dispute exceeded the value of $3,000, exclusive of interest and costs. The proof showed that three of the complainants in the original bill, Brame, Maurice, and Hill, owned stock in the National Company of a value largely in excess of $3,000 each, and the amended and supplemental bill brought in as complainants a large number of other stockholders with holdings in excess of that amount, although the holdings of many of complainants were less than $3,000. The suit, however, whether tested by the original or by the amended bill, was not one in which the individual complainants sought each for himself to set aside the transfer which he had made and to recover the stock with which he had parted. Its purpose was to rescind the contract made by the National stockholders collectively with Hare & Chase and to restore to them collectively the rights in the National Company with which they had parted under that contract. While each stockholder had made a separate transfer of his stock, he had done this pursuant to the provisions of the contract which he together with the other stockholders had entered into, and one of the conditions of which was that 70 per cent. of the outstanding stock should be transferred before any transfer should be effective. After the exchange was completed, Hare & Chase owned the entire stock of the National Company; and it was this stock that complainants sought to subject to the claims of those who had been defrauded to the end that their rights in the National Company might be restored. They were seeking to rescind on the ground of fraud a contract to which all of the defrauded stockholders were parties, and to recover for the benefit of these stockholders the fund created by the transfers under the fraudulent contract. A further purpose of the bill was to protect the assets of the National Company from wrongful diversion by Hare & Chase, who through stock ownership controlled its board of directors.

It is clear, we think, that the matters involved in the suit were (1) the fund (i. e. the stock of the National Company) which complainants were seeking to recover for the benefit of themselves and other stockholders who had been defrauded under the contract in which all had joined, and (2) the assets of the National Company, the protection of which in the interest of former stockholders was asked in the bill. Handley v. Stutz, 137 U. S. 366, 11 S. Ct. 117, 34 L. Ed. 706. In such case it was clearly proper to allow a defrauded stockholder, even though his holdings were of a value less than the jurisdictional amount, to intervene for the purpose of sharing in the recovery of the fund in controversy as well as for the purpose of protecting the assets of the corporation in which he claimed an interest. The case is not one where plaintiffs, having separate and distinct demands, have united for convenience and economy, but where several plaintiffs have united for the assertion of a right in which they have a common and undivided interest. Troy Bank v. Whitehead, 222 U. S. 39, 41, 32 S. Ct. 9, 56 L. Ed. 81.

And it not necessary to decide whether claims of complainants here are of such a character that they could be aggregated for the purpose of jurisdiction, if none of them equaled the jurisdictional amount. See discussion in Lion Bonding Co. v. Karatz, 262 U. S. 77, 43 S. Ct. 701, 67 L. Ed. 1206. As we have seen, the claims of a number of the complainants are far in excess of the jurisdictional amount; and the only question is whether those complainants whose claims are less than such amount shall be allowed to join in the suit for the purpose of recovering and sharing in the fund in controversy and protecting the assets in which all of the defrauded stockholders have an interest. It is well settled that this question must be answered in the affirmative. Handley v. Stutz, supra; Stewart v. Dunham, 115 U. S. 61, 5 S. Ct. 1163, 29 L. Ed. 329; Conway v. Owensboro Savings Bank (C. C.) 165 F. 822; Id. (C. C.) 185 F. 950; Huff v. Bidwell (C. C. A. 5th) 151 F. 563; Stanwood v. Wishard (C. C.) 134 F. 959.

### The Question of Fraud.

The court below found that the stock of the National stockholders was procured by Hare & Chase by means of false and fraudulent representations; and we think that this finding is fully sustained by the evidence. The facts are that, while the National Company had suffered a slowing up of business, was in need of additional capital, and was anxious to effect a favorable consolidation with a larger and stronger company, it was in sound financial condition, and its stock was worth more than par. Its officers were approached by representatives of Hare & Chase who proposed to take it over and give its stockholders stock in Hare & Chase in exchange for their holdings. As an inducement to the proposed exchange, it was represented that Hare & Chase was the largest independent company in the United States, doing an "exclusive automobile finance business"; that 90 per cent. of its business was with cars of certain standard makes; that it had capital of $5,000,000, surplus of $970,459, and reserves of $884,423; that, since the company had been in business, its credit losses had averaged approximately one-half of 1 per cent.; and that credit losses sixty-five times as great as losses sustained in the past would be required to exhaust its capital surplus and reserves. These statements were made in a letter of June 30, 1926, which was laid before the meeting of the stockholders of the National Company and was accompanied by an auditor's statement supporting the figures quoted. This letter contained the following very significant paragraphs:

"Our receivables represent an average indebtedness per individual of approximately $250.00 owing from approximately 80,000 individuals. With this tremendous spread and a credit investigation having been made of each individual by our own organization in advance of our purchasing the note, it would seem incredible that our experience on losses in the past could be increased to any great extent.

"Over 90% of our business is with cars of the following makes:

| Ford | Studebaker | Overland-Willys-Knight |
| Chevrolet | Maxwell-Chrys. | Buick-Nash |
| Dodge | Hupmobile | Hudson-Essex |

"Our company investigates the credit of every purchaser in advance of approving the sale by the dealer. We only write business in territories where we are organized for efficient credit and collection work, and the result in credit efficiency is best illustrated by the fact that on November 30th, our paper over sixty days past due only amounted to $64,979.00 against a turn-over for the 12 preceding months of $45,421,085."

A committee of stockholders of the National Company visited Philadelphia and conferred with one Jones, vice president of Hare & Chase, relative to its financial condition. He repeated to the committee the

representations contained in the letter of June 30th, and neither he nor any other official of Hare & Chase apprised the committee or any one connected with the National Company that there was anything in connection with the business of Hare & Chase to put any different aspect upon its affairs from that presented by the letter of June 30th and the accompanying financial statement. The committee returned, and, to a meeting of National stockholders held July 17th, reported in favor of accepting the proposition which Hare & Chase had made. The stockholders unanimously decided to accept the proposition, and later transferred to Hare & Chase their shares of stock in accordance therewith. There can be no question that in so doing they relied upon the statements contained in the letter of June 30th, which were repeated to their committee, or that they would have rejected the offer of Hare & Chase if they had understood the true condition of its affairs.

As a matter of fact, Hare & Chase, instead of being in the flourishing condition depicted by the letter of June 30th, was concealing a condition which constantly threatened disaster and ultimately resulted in ruin. This condition was the result of its investment in paper secured by liens on taxicabs, which at the time aggregated more than $4,500,000. Taxicab paper was generally recognized in the business as not providing a safe form of investment, and was almost universally eschewed by conservative companies. The experience of Hare & Chase with it had been most unfortunate. A year or so prior to this time it had begun handling taxicab paper for the General Finance Company of Indianapolis. The volume of the paper thus handled had grown from one million to four and one-half million dollars. It was not paid when due, and it had become necessary to repossess the taxicabs upon which liens were held. These cabs had then been reconditioned, and liens had been taken for the original loans plus the cost of reconditioning. This cancer eating at the very heart of the delicate financial structure which Hare & Chase had built up is thus graphically described in the report of the special master:

"The testimony discloses that from its inception the volume of the General Finance rediscounts outstanding, almost continuously increased. The original contract amount of $1,000,000.00 had become 2½ million on November 30, 1925, and 4½ million on June 30, 1926. The past dues had also heavily increased during that time, the voluminous correspondence between Alfred Hare and Githens, president of General Finance, including constant references to the unsatisfactory conditions of the latter's obligations in this respect. The refinancing of cabs had resulted, in many instances, in a heavy increase of the indebtedness secured by particular vehicle by reason of the addition of reconditioning and refinancing costs to the original obligation. In some cases, a cab upon which $1,900.00 was originally loaned, became security for as much as $3,300.00 and from about January 1, 1926 the increase in General Finance Corporation's obligations to Hare and Chase represented entirely an increase of loans without additional security except the increase in value of cabs due to reconditioning. November 30, 1926, Hare and Chase had on hand $789,000.00 of General Finance notes representing defaulted installment payments on its obligations."

At the time of the letter of June 30th, this taxicab situation was bad and constantly growing worse. The company had on hand over $600,000 of the paper which was past due, in addition to approximately $60,000 of past-due truck paper. It had advanced large sums for reconditioning, and this was secured merely by increase in the amount of the liens held against the secondhand taxicabs. The trouble which the officers of the company were having with this paper was sufficient notice that it was not worth anything like face value; and it is significant that less than half a million dollars, or only about 10 per cent., was ultimately realized from it.

The presence of this paper and the situation with regard thereto rendered false practically every statement contained in the letter of June 30th. See Fletcher Cyclopedia of Corporations, vol. 2, p. 1368; Manning v. Berdan (C. C.) 135 F. 159. That letter stated that 90 per cent. of the business of Hare & Chase was with cars of certain standard makes. As a matter of fact, more than 10 per cent. of its business was not only with, but tied up with, questionable paper on commercial taxicabs. It represented that on November 30th Hare & Chase had paper sixty days past due of only $64,979, the clear inference being that the past-due paper was negligible in amount, whereas the fact was that on December 30, 1925, Hare & Chase had past-due taxicab paper amounting to $345,000, and at the time of the representation had past-due paper exceeding $660,000. It represented that the losses of Hare & Chase had been only one-half of 1 per cent.,

and that it was incredible that, with the spread of its credit system, the percentage of losses could be greatly increased, whereas the presence of the taxicab paper meant that the company was inevitably facing losses of most serious proportions. It represented that the surplus of Hare & Chase was $970,459 and reserves $884,423, whereas a proper valuation of the taxicab paper would have wiped out surplus and reserves and a large part of the amount set up for capital. As was well said by the learned judge below: "In this view of the evidence, it is perfectly clear that at the time of the exchange of stocks, Hare & Chase, instead of having nearly $7,000,000 of capital, surplus and reserves, was in imminent peril of having this item of its balance sheet entirely absorbed in the payment of losses accruing out of improvident advances of money in the manner above indicated. The master finds, and I think correctly, that Jones, the vice-president with whom the negotiations for the acquisition of the stock of the National Company were had, had either actual knowledge or the means of knowledge of the volume of his company's taxicab paper. I think he should likewise have found that the character of the correspondence between Githens, president of the Pittsburg Company, and Jones and the fact that the latter was in active charge of much of the company's business and during Hare's absence in Europe in the summer of 1926, largely responsible for its policy, created an unescapable inference that he not only knew the fact but realized the precarious position of his company thus produced."

It is idle to argue that Hare & Chase had hopes of ultimately realizing the face value of the paper. In the light of the experience of the company, such hopes were without any adequate foundation; and certainly they furnished no warrant for including such paper at its face value among the assets of the company without an accompanying statement which would apprise a prospective purchaser of the company's stock of the true situation.

And it is no answer to the charge of fraud to say that Jones did not know the financial condition of his company when he put forward a statement of its condition for the guidance of prospective purchasers of its stock with whom the company was dealing. Jones was vice president of the company, and dealt with the committee of National stockholders when it visited Philadelphia for the purpose of making investigation. He made representations orally as well as by letter showing that Hare & Chase was in splendid financial condition. By reason of its holdings of the questionable taxicab paper, which Jones did not disclose, these representations conveyed an entirely false idea as to its financial condition. It is elementary that a false representation may, in contemplation of law, be made fraudulently so as to afford a right of action in damages, and a fortiori, ground of equitable proceedings, when made under circumstances in which the party ought to know, if he does not know, of its falsity; as, where having "special means of knowledge," it is his duty to know. Bigelow on Fraud, 509, 516; Cook on Stock and Stockholders, § 145; 12 R. C. L. p. 336; Prewitt v. Trimble, 92 Ky. 176, 17 S. W. 356, 36 Am. St. Rep. 586; Lehigh Zinc & Iron Co. v. Bamford, 150 U. S. 665, 14 S. Ct. 219, 37 L. Ed. 1215.

Furthermore, it is well settled that a false representation of a material fact constituting an inducement to a contract, on which the opposite party has a right to rely, is ground for rescission in equity, though the party making the representation may have been ignorant as to whether it was true or false; the real inquiry being, not whether the party making the representation knew it to be false, but whether the opposite party believed it to be true, and was misled by it in entering into the contract. Kell v. Trenchard (C. C. A. 4th) 142 F. 16, 23; Halsey v. Minnesota-South Carolina Land Co. (C. C. A. 4th) 28 F.(2d) 720; Smith v. Richards, 13 Pet. 26, 10 L. Ed. 42; 12 R. C. L. 345, 346; note Ann. Cas. 1913C, page 63.

### The Rights of the Keystone Company.

We think it clear that the judge below was correct in holding that the contract between the National stockholders and Hare & Chase could not be rescinded and the stock in the National Company restored to complainants, because that stock had been pledged by Hare & Chase to secure bona fide loans and the Keystone Company held it for value and without notice of the fraud which had been perpetrated. The circumstances surrounding the Keystone's acquisition of the stock are as follows:

The Royal Indemnity Company was a guarantor of paper which Hare & Chase had deposited with the Equitable Trust Company under a trust agreement. On the failure of the makers of this paper to pay it at maturity, the Indemnity Company became

liable thereon, with right to reimbursement from Hare & Chase. In January, 1927, Hare & Chase became financially embarrassed because of the failure of the makers of this paper to pay same on maturity; and its officers had a conference with representatives of the Indemnity Company and of the Royal Insurance Company of Liverpool which owned the stock of the Indemnity Company. At this conference it was thought that the situation could be worked out by the Royal interests making loans to Hare & Chase and continuing to guarantee Hare & Chase paper. As a condition of making the loans and continuing the course of guaranteeing paper, however, the Royal interests demanded that collateral be pledged with them to secure the loans and that sufficient Hare & Chase stock be transferred to enable them to control and direct its policy. A contract to this effect was entered into and loans were made and collateral pledged pursuant thereto. Beginning with an advancement of $35,000 on January 25, 1927, and followed with $465,000 on January 27th, $500,000 on February 14th, $400,000 on February 28th, and $200,000 on March 2nd, these loans continued until a total of $3,684,900 had been loaned, in addition to $653,506.42 paid under the guarantee of the Indemnity Company and $402,083.45 reloaned from proceeds of collateral pledged.

The first $1,600,000 was advanced by the Royal Insurance Company through one Fortington, its financial representative in the United States, and the notes evidencing the loans were made payable to him. Shortly after entering into the agreement, however, the representatives of the Royal Insurance Company, realizing that the matter could be more satisfactorily administered through an independent corporation, organized the Keystone Company and transferred to it the notes of Hare & Chase and the collateral pledged as security therefor, taking in exchange the stock of the Keystone Company, and subsequent loans were made through the Keystone Company. That company later assumed the collection of outstanding Hare & Chase paper for the account of Hare & Chase and the purchase of new paper which was discounted through Hare & Chase. This, however, had no connection with the loans to Hare & Chase or the notes taken in connection with the loans or the collateral pledged as security therefor.

At the time of the original loan by the Royal interests, notes were given by Hare & Chase aggregating $1,000,000, and collateral was pledged having a par or face value of $2,696,723.14 included in which was the stock in the National Company amounting to $262,200. The original notes given Fortington provided that collateral pledged should be held as security for the particular notes and any other notes of the maker held by the holder, and the notes made to the Keystone Company provided that the collateral originally pledged with Fortington should be held as security therefor. There is no question, therefore, that the collateral pledged is held by the Keystone as security for all the loans made; and the record leaves no doubt that the amount of these loans was largely in excess of the value of the collateral.

The master and the District Judge have found that the loans relied upon by the Keystone Company were made in good faith; that the collateral including the stock of the National Company was actually pledged; that neither the representatives of the Royal interests nor the Keystone Company had notice of the fraud on the National stockholders; and that the collateral pledged is not sufficient to repay the loans. It is well settled that findings of the master approved by the judge will not be disturbed on appeal, unless clearly wrong; and there is nothing in the record here to justify disturbing them. On the contrary, a careful examination of the record convinces us that they are correct.

If we understand the argument of counsel for the National stockholders with regard to this phase of the case, it is: (1) That there was a merger of the National Company with Hare & Chase which extinguished the existence of the National Company, and that for that reason the pledge of its stock conferred no rights on the pledgee; (2) that the Royal representatives and the Keystone Company took the stock with notice of the equities of the National stockholders; (3) that the transfer was void as a preference of the Royal Indemnity Company; (4) that there was no actual delivery of the stock, and consequently no valid pledge thereof; and (5) that upon a proper accounting of collateral pledged the loans would be paid off and the National stock left to be reached by the National stockholders. None of these contentions can be sustained.

On the contention as to merger, it is clear that what occurred was a sale or transfer by the stockholders of their corporate stock, not a sale by the corporation of its assets. The corporate existence of the National Company was not affected thereby; but it

was kept alive and was functioning with a full quota of officers and directors and a corporate existence entirely separate and distinct from that of Hare & Chase. The sale of its stock to Hare & Chase no more extinguished its existence or destroyed the rights of holders of stock to pledge same than a sale of stock by its stockholders to any other individual or corporation would have done. After acquiring the stock of the corporation, Hare & Chase might have liquidated or dissolved it; but this was not done, nor was anything done which in any way impaired the right to pledge the stock acquired or exercise any other of the usual rights of ownership.

In the case of American Railway Express Co. v. Fleishman, Morris & Co., 149 Va. 200, 141 S. E. 253, upon which complainants rely, there was a transfer of the assets of one corporation to another in exchange for its stock; and the question was the liability of the latter corporation for the debts of the former to the extent of the assets acquired. A similar question was before this court in the case of Cobb v. Interstate Mortgage Co. (C. C. A. 4th) 20 F.(2d) 786, 789. But it is clear that the doctrine of these and similar cases has no application here. "There is no consolidation or merger merely because one company owns a majority or all the stock of another company." Fletcher, Cyclopedia of Corporations, vol. 7, § 4667; Jessup v. Ill. Cent. R. Co. (C. C.) 36 F. 735, 741; Calor Oil & Gas Co. v. Franzell, 128 Ky. 715, 109 S. W. 328, 33 Ky. Law Rep. 98, 36 L. R. A. (N. S.) 456; Venner v. Chicago City R. Co., 258 Ill. 523, 543, 101 N. E. 949.

And there is absolutely no evidence that the Royal representatives or the Keystone Company had any knowledge of the fraud perpetrated on the National stockholders or knowledge of anything to put them on notice of the fraud at the time that they made the loans and received the pledge of the collateral as security therefor. It is argued that the reports made to the Royal Indemnity Company as to the paper which it guaranteed were sufficient to put it on notice that Hare & Chase was dealing in taxicab paper, that the taxicab indebtedness was being pyramided, and that the financial condition of Hare & Chase was impaired as a result; but the question is, not whether the Royal representatives had reason to believe that Hare & Chase was dealing in taxicab paper or that its financial condition was impaired, but whether they had notice of the fraud by which the stock in the National Company was acquired, i. e., of the false representations made to induce the exchange by the National stockholders. There is nothing whatever to show that they had such knowledge or notice.

The other points do not require discussion. Complainants are not creditors attacking a preferential transfer by a bankrupt or insolvent for the benefit of an insolvent estate, but are seeking to recover for themselves property which they have transferred and which has been pledged by the transferee with a third party. Even if they had the rights of creditors, they could not attack the pledge here as a voidable preference, for the reason that it was made for a present consideration and not to secure a pre-existing debt. On the question of delivery, the evidence shows beyond peradventure that the stock was actually delivered at the time of the pledge. And as to accounting for collateral, there can be no question upon the record that the value of the collateral pledged was less than the indebtedness secured and that upon no theory could the pledgee be deprived of any of the stock held by it. Under such circumstances, it is not necessary to consider a number of interesting points of law ably argued by counsel.

### The Award of Damages to the National Stockholders.

Not being able to grant rescission because the stock of the National Company acquired by the fraud of Hare & Chase had been pledged to a bona fide holder for value without notice of the fraud, the learned judge below granted the defrauded National stockholders such relief as lay within his power by awarding them damages against Hare & Chase. This award was made in favor of stockholders who testified that they relied upon the false representations and also in favor of those who participated by proxy in the stockholders' meeting to which the committee reported and which decided upon the exchange of stock, but was denied to stockholders who neither testified to reliance upon the representations nor participated in the meeting. The exceptions to this action present four questions: (1) Whether it was proper to make any award of damages to stockholders; (2) whether it was proper to make the award in favor of the stockholders who did not testify as to reliance but participated by proxy in the stockholders' meeting; (3) whether it was proper to deny an award to those who neither testified to reliance nor participated in the meeting; and

(4) whether Brame and other stockholders who participated in stockholders' meetings of Hare & Chase, after learning of the fraud, are by that action precluded from recovery.

We think that, upon the first or general question, there can be no doubt that it was proper to make an award of damages to the defrauded stockholders. The rule in such cases is well stated by Professor Pomeroy in his Equity Jurisprudence (4th Ed.) vol. 1, p. 374, as follows: "If a court of equity obtains jurisdiction of a suit for the purpose of granting some distinctively equitable relief, such, for example, as the specific performance of a contract, or the rescission or cancellation of some instrument, and it appears from facts disclosed on the hearing, but not known to the plaintiff when he brought his suit, that the special relief prayed for has become impracticable, and the plaintiff is entitled to the only alternative relief possible of damages, the court then may, and generally will, instead of compelling the plaintiff to incur the double expense and trouble of an action at law, retain the cause, decide all the issues involved, and decree the payment of mere compensatory damages."

The rule is thus tersely stated by Judge Dent in Robinson v. Braiden, 44 W. Va. 183, 28 S. E. 798, 802: "It is a well-established rule that equity, having taken jurisdiction for one purpose, will retain it for others necessary to the final settlement of all matters involved in the litigation between the parties, growing out of, and connected with, the subject-matter of the suit. 1 Beach, Mod. Eq. Jur. § 21 (see cases cited); Gormley v. Clark, 134 U. S. 338, 10 S. Ct. 554 [33 L. Ed. 909]; Beecher v. Lewis, 84 Va. 630, 6 S. E. 367; Walters v. Bank, 76 Va. 12, 19. The principle is almost universal that jurisdiction of the subject-matter does not depend upon the ultimate existence of a good cause of action in the particular case. Where equity has acquired jurisdiction upon equitable grounds, it may go on to complete adjudication, establish legal rights, and grant legal remedies otherwise beyond its scope; and no fact subsequently ascertained, showing want of good cause of action in the particular case, can defeat that jurisdiction."

See, also, Holland v. Anderson, 38 Mo. 55; Case v. Minot, 158 Mass. 577, 33 N. E. 700, 22 L. R. A. 536; Milkman v. Ordway, 106 Mass. 232; Hazen v. Lyndonville Nat. Bank, 70 Vt. 543, 41 A. 1046, 67 Am. St. Rep. 680, 689; Cincinnati & C. Traction Co. v. American Bridge Co. (C. C. A. 6th) 202 F. 184; Waite v. O'Neil (C. C. A. 6th) 76 F. 408, 34 L. R. A. 550; Woodcock v. Bennet, 1 Cow. (N. Y.) 711, 13 Am. Dec. 568, 586; Hall v. Delaplaine, 5 Wis. 206, 68 Am. Dec. 57; note to Pomeroy's Equity Jurisprudence (4th Ed.) vol. 1, pp. 374 to 379, and cases there cited.

Argument is made in behalf of Hare & Chase that, since complainants are not entitled to rescission, they are not entitled to damages, and reliance is placed upon cases such as Houldsworth v. City of Glasgow Bank and Liquidators, 5 App. Cas. 317; Oakes v. Turquand, Law Rep. 2 H. L. 325; Wilson v. Hundley, 96 Va. 96, 30 S. E. 492, 70 Am. St. Rep. 837; and Virginia-Carolina Rubber Co. v. Flanagan, 150 Va. 276, 142 S. E. 376. These cases, however, have no application here. The Virginia cases hold that a stockholder whose subscription has been obtained by fraud may not retain the stock and sue for damages, but must offer to return the stock and sue in equity for rescission. That is exactly what complainants here have done, and damages are being awarded them in lieu of a return of the consideration with which they have parted solely because its return has been made impossible, not by them, but by the corporation which perpetrated the fraud. The English cases cited and the current of authority in this country are to the effect that one who has been induced by fraud to subscribe to the stock of a corporation may not rescind the subscription or recover damages from the corporation, after insolvency has intervened and the assets of the corporation are being administered for the benefit of creditors, as against creditors who extended credit after the subscription. This is upon the principle that the assets of the insolvent corporation constitute a trust fund for the benefit of its creditors. Fletcher, Cyclopedia of Corporations, vol. 2, pp. 1411–1419, and cases there cited. This doctrine, however, is asserted for the protection of creditors. Fletcher, vol. 2, p. 1419; Newton Nat. Bank v. Newbegin (C. C. A. 8th) 74 F. 135, 33 L. R. A. 727; In re Eureka Furniture Co. (D. C.) 170 F. 485. It cannot be availed of to shield the corporation which perpetrated the fraud.

The judge was clearly right in denying an award to the stockholders who did not participate in the creditors' meeting and did not testify to reliance upon the fraudulent representations made. It is elementary that to recover on the ground of fraudulent representations one must have relied upon them; and, as to the stockholders who did

not participate in the meeting or testify in the case, there is nothing to show such reliance. And we think it is equally clear that he was right in making an award to the stockholders who participated in the stockholders' meeting by proxy and voted to accept the Hare & Chase offer. The evidence as to the proceedings at that meeting leaves little doubt that the action there taken was because of reliance upon the representations made in the letter of Hare & Chase and verbally to the committee of stockholders; and it is, of course, immaterial whether the stockholder himself acted upon the representations made or whether he acted through an agent. The fact that these stockholders were represented by proxy shows either that they were satisfied with the proposition of Hare & Chase because of the statements in the letter sent to them or that they were delegating the decision to some one in whom they had confidence. In either event, they are entitled to recover; for it is manifest that one who is defrauded through false representations made to his agent upon which the agent relies is in no different position from one who relies upon such representations himself.

And we agree with the judge below that Brame and the other stockholders who participated in the Hare & Chase stockholders' meeting of March 4th are not precluded from recovery by reason of that participation. It is true that ordinarily one who has been defrauded, upon learning of the fraud, is put upon his election either to rescind the contract or stand upon it and recover the damages sustained, and that, if he does anything which amounts to a ratification, he will not be allowed to rescind. But here rescission was not possible, because the National stock, as we have seen, had been pledged to a bona fide holder for value without notice. The point raised would come with more force if rescission were being awarded; but these stockholders are not obtaining a rescission of their contract, but merely damages for the fraud perpetrated upon them; and the general rule is that one who has been defrauded may recover the damages sustained as a result of the fraud, notwithstanding he has affirmed the contract. Fletcher, vol. 2, p. 1395. It is true that in some of the Virginia decisions, it is held, contrary to the general rule (Fletcher, vol. 2, p. 1395), that one who subscribes to stock because of fraudulent representations must seek rescission and may not affirm and sue the corporation for damages; but it is clear that this rule has no application, where, under the circumstances of the case, rescission is not possible, as where the corporation has parted with the consideration received in such way that it cannot be restored.

## The Controversy as to Assets Transferred to the General Finance Corporation.

After Hare & Chase acquired the stock of the Virginia Company, Brame was elected president of that corporation and placed in charge of its affairs. Among its assets were notes secured by chattel mortgages other than automobile paper worth in the aggregate $115,453.98. Brame agreed with the officials of Hare & Chase to organize a new corporation to handle this paper; and the terms of the agreement briefly stated were as follows: The corporation was to have preferred stock of $100,000; 2,000 shares of common stock were to be issued. The $115,000 of Virginia Mortgage paper was to be transferred to it; and Hare & Chase was to accept $60,000 of preferred stock with 600 shares of common stock and notes for $55,453.98, maturing monthly over a period of six months and secured by the transferred Virginia paper, in exchange therefor. At the same time another agreement was entered into, by the terms of which Hare & Chase was to accept from the corporation to be organized stock of Hare & Chase at an agreed ratio in exchange for the stock of the corporation issued to it, provided the common stock of Hare & Chase was worth at the time as much as $23.00 per share, this exchange privilege being limited, however, so as to permit the exchange for only one-sixth of the stock in any one month.

Pursuant to this agreement, Brame proceeded on January 10, 1927 to organize the General Finance Corporation of Virginia, heretofore and hereafter referred to as the General Company, with himself as president. In that capacity he executed to the secretary and treasurer of the Virginia Company, of which he was also president, a receipt for the $115,453.98 of paper, but gave that company no consideration for same. He issued to Hare & Chase $60,000 of preferred and 600 shares of common stock, and executed to that corporation notes of the General Company for a total of $55,453.98, all of which he forwarded to Hare & Chase on January 11th, pursuant to the agreement theretofore had with its officials. While Brame testifies that the transfer of the Virginia Company paper was authorized by the directors of that corporation, no minutes showing such action by the directors were produced; and, if the

directors did authorize the transfer, it is clear that the only directors present authorizing it were persons who were also directors of the General Company, i. e. Brame, Maurice, and Shopoff. Brame issued fifty qualifying shares of common stock to the directors of the General Company; and later, for a consideration of $20, issued the remaining 1350 shares of common stock to himself.

On January 28th Brame was in Philadelphia in connection with the financial difficulties of Hare & Chase. While he was there, Jones, the vice president of Hare & Chase, gave back the stock and notes to him. There is some controversy as to the circumstances surrounding the return, and as to whether it was made to Brame in his capacity as president of the Virginia Company; but certain it is that Brame carried the stock and notes back to Richmond with him and held them there until after the institution of these suits. No stock was ever issued to the Virginia Company, nor were any notes executed to it. On February 8th, when Hare & Chase was in such great financial difficulties that it was arranging to surrender control to the Royal interests, and when its common stock was worth little, if anything, Brame wrote a letter to Hare & Chase inclosing certificates of Hare & Chase stock to take up one of the notes executed by the General Company and $10,000 of its preferred stock. On February 21st, when the financial condition of Hare & Chase was even worse, he forwarded additional certificates of Hare & Chase stock, with a letter stating that they would take up in full the remaining $50,000 of General Company's preferred stock under the previous agreement.

The position of the General Company is, that as a result of the foregoing transactions, the paper of the Virginia Company has been transferred to the General Company and is held by it subject only to a lien for the balance due on the notes executed to Hare & Chase amounting to approximately $45,000. If this be correct, then, as a result of the manipulations of Brame, the Virginia Company and its stockholders, without any consideration whatever, have been deprived of assets to the net value of more than $70,000, which have gone to a corporation practically all of the stock of which is owned by Brame, having been purchased by him for $20. In other words, Brame, while president of the Virginia Company, has put through a series of transactions as the result of which, by investing $20 in the common stock of the General Company and surrendering to Hare & Chase some of its practically worthless stock, which transactions benefited the Virginia Company not one iota, he has obtained for his own use and benefit, or, what is the same thing, for the use and benefit of the corporation which he owns, assets of the Virginia Company of a net value exceeding $70,000. It is needless to say that no such position can be sustained.

We shall not take time to discuss the technical irregularities which vitiate the proceedings upon which the General Company relies. The fact that stock was voted Hare & Chase merely by the directors and not by the incorporators or stockholders of the General Company; the fact that the General Company never secured the $100,000 subscription to its preferred stock as provided by the agreement with Hare & Chase; the fact that the General Company was authorized to redeem its stock by exchange of Hare & Chase stock only to the extent of a certain amount per month and only when Hare & Chase stock was of a certain value; the fact that the sale of the Virginia Company's paper was not authorized at a stockholders' meeting—all of these matters might be discussed at length, as they have been in the report of the referee and the briefs of counsel. We prefer, however, to place our decision on the broad ground that the transfer of the assets, if there was a transfer, from the Virginia to the General Company, was void because made without consideration moving to the Virginia Company, and because made by officers and directors who were also officers and directors of the General Company and were clearly acting against the interest of the Virginia Company in the transaction. It is well settled that such a transfer will not be upheld. Geddes v. Anaconda Copper Co., 254 U. S. 590, 599, 41 S. Ct. 209, 212, 65 L. Ed. 425; Corsicana Nat. Bank v. Johnson, 251 U. S. 68, 90, 40 S. Ct. 82, 64 L. Ed. 141; Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 588, 23 L. Ed. 328; Finefrock v. Kenova Mine Car Co. (C. C. A. 4th) 22 F.(2d) 627, 632; Addison v. Lewis, 75 Va. 701, 720; Fletcher, Cyclopedia of Corporations, vol. 4, §§ 2338, 2376, 2378. As said by the Supreme Court in Geddes v. Anaconda Copper Co., supra: "The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged *the burden is upon*

*those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration.* Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy. Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 588, 23 L. Ed. 328; Thomas v. Brownville, Ft. Kearney & Pacific R. R. Co., 109 U. S. 522, 3 S. Ct. 315, 27 L. Ed. 1018; Wardell v. Railroad Co., 103 U. S. 651, 658, 26 L. Ed. 509; Corsicana National Bank v. Johnson, 251 U. S. 68, 90, 40 S. Ct. 82, 64 L. Ed. 141." (Italics ours).

The case has been ably presented by counsel, and the record shows that it was carefully considered by the special master and the learned judge below. After full consideration, in the light of the briefs and arguments, we think that the decree below was in all respects correct, and same will accordingly be affirmed. One-third of the costs on this appeal will be assessed against the appealing National stockholders, one-third against Hare & Chase, and one-third against the General Finance Corporation.

Affirmed.