FRANCIS X. McQUADE, Appellant, *v.* CHARLES A. STONEHAM, Respondent, Impleaded with JOHN J. McGRAW, Defendant.

First Department, May 29, 1930.

*Isaac N. Jacobson* of counsel [*Mortimer M. Kassell* with him on the brief; *May & Jacobson*, attorneys], for the appellant.

*Leo J. Bondy* of counsel [*Jonas N. Lewis* with him on the brief], for the respondent.

MARTIN, J.   The plaintiff by this equity action seeks to enforce the terms of a written agreement which it is alleged the defendant Stoneham repudiated after receiving valuable rights thereunder.

The defendant Stoneham became the owner of 1,306 shares of stock prior to February 21, 1919, which constituted a majority of the capital stock of the National Exhibition Company, a New Jersey corporation, which has its offices for the regular transaction of business in the city of New York and where its entire business is conducted.

The plaintiff and the defendant McGraw each purchased from the defendant Stoneham seventy shares of his stock.  For his seventy shares of stock the plaintiff paid to Stoneham $50,338.10 and entered into an agreement reciting that " by understanding and arrangement between the parties hereto,. the parties of the second and third parts [plaintiff and McGraw] were to be associated with the party of the first part, and become owners through said arrangement of part of the stock so acquired by the party of the first part [Stoneham]."   The agreement also provided for the transfer of the seventy shares to McGraw and payment therefor; for the transfer of seventy shares to the plaintiff and payment therefor; for the exercise of power over such transferred stock by Stoneham until he acquired a majority in his own right; for the purchase by the survivors of the stock of any of the parties deceased; for continuing all of the parties as directors and officers of the cor-

poration, the provision which is the basis of this action; for limiting the salaries of the parties as officers and directors and for preventing changes in the by-laws or capitalization, without the consent of all; for the offer to the others of the shares of any of the parties desiring to sell his stock; for the shares of stock to be indorsed as subject to the agreement; for the continuance of the agreement so long as the parties remained such stockholders, and other matters not now of importance; and that the agreement was to be binding as to all other provisions if any covenant or condition be declared illegal.

In December, 1922, the capital stock was increased from 2,500 to 12,500 shares and a 400 per cent stock dividend was declared. Additional stock was issued to the parties according to their holdings, each receiving four additional shares for each share he then owned, and a second agreement was entered into by the parties providing that the agreement of February 21, 1919, should apply to such additional shares, with " the same force and effect as if the agreement of February 21, 1919, between the parties hereto had been made to include not only the aforesaid 1306 shares, but also said additional 5224 shares of stock thereafter issued."

Clause VIII of the agreement of February 21, 1919, the provision that has been made the subject of this action, provides as follows: " The parties hereto will use their best endeavors for the purpose of continuing as directors of said Company and as officers thereof the following: Directors: Charles A. Stoneham, John J. McGraw, Francis X. McQuade, with the right to the party of the first part to name all additional directors, as he sees fit: Officers: Charles A. Stoneham, President, John J. McGraw, Vice-President, Francis X. McQuade, Treasurer."

The defendants have accepted all the benefits given by the agreement. In accordance therewith Stoneham has been and is the president, and McGraw has been and is the vice-president of the corporation. There seems to have been omitted from the complaint the direct allegation that the plaintiff was the treasurer, but the fair inferences from the facts alleged supply this omission, for it is stated that the plaintiff " continued to act as such treasurer until said May 2, 1928," and that he continued " as holdover treasurer " from December, 1925, until May, 1928, and that thereafter the plaintiff demanded that the defendants " reinstate " him as director and treasurer, to which the defendants replied that they would consider the matter. The omission is a mere technical defect which could be supplied by amendment.

All the parties were elected directors. The board of directors consisted of seven members. The other four were selected by

Stoneham, and the facts stated indicate clearly that he has complete control and that they are completely dominated by him.

It appears that from July, 1921, until January, 1925, Stoneham caused substantial "loans" to be made out of the corporation's funds to himself, directly and through the medium of other persons and of other companies which he owned and controlled, whereupon the plaintiff "requested" that the payment thereof be secured, and thereupon Stoneham indorsed and executed notes for these loans to a total of $280,035, and deposited with the corporation 2,164 shares of its stock as security for the payment thereof.

Stoneham was thus compelled by the plaintiff to acknowledge this large indebtedness and to secure its repayment. The next meeting for the election of officers was held in December, 1925. At that meeting Stoneham caused his personal attorney, Leo J. Bondy, to be nominated in opposition to the plaintiff for the office of treasurer. The plaintiff demanded that the defendants use their best endeavors to cause the election of the plaintiff. There were seven members on the board. One of them, Ferguson, was absent; all the others were present. Bondy, Robertson and Stoneham's brother, by and at the direction of the defendant Stoneham, voted for the election of Bondy. The other three directors were the plaintiff and the defendants. If they had voted for the plaintiff, he would have been continued in office. The plaintiff and McGraw voted for the election of the plaintiff, but Stoneham refused to vote, thereby creating a majority vote in favor of Bondy, and Bondy "was declared elected treasurer, his term not to commence, however, before January 11, 1926, and not thereafter until he qualified." Bondy, however, did not qualify and the plaintiff continued to act as such treasurer. It is also alleged that such continuance of the plaintiff as holdover treasurer was in effect an implied threat to remove plaintiff as treasurer unless he assented to the improper use by the defendants of the funds and property of the said National Exhibition Company and submitted to the will of the defendant Stoneham.

Subsequently the plaintiff demanded that Stoneham pay to the corporation interest upon the loans made as aforesaid. Stoneham called a special meeting of the board of directors for May 2, 1928, and on that day, in accordance with the plaintiff's demand, Stoneham paid $13,975.44 as interest. All the directors were present. One moved for the election of a treasurer, and thereupon Stoneham's brother nominated Bondy. The plaintiff placed himself in nomination and demanded that the defendants use their best endeavors to cause plaintiff's election as treasurer. The defendants, however, refused to do so. Stoneham's brother and Bondy,

Robertson and Ferguson voted for Bondy. That constituted a majority of the board. The defendant refused to vote.

Thereupon Stoneham declared Bondy elected treasurer. Bondy qualified and has ever since been acting as treasurer. Bondy was re-elected treasurer in November, 1928, and again in 1929. It is also alleged that at the annual meeting of the stockholders in November, 1928, and again at the annual meeting in November, 1929, the defendants in violation of their agreement with the plaintiff, caused some person unknown to the plaintiff to be elected a director in the place and instead of the plaintiff.

The agreement of February 21, 1919, provided that no salaries were to be paid to the officers or directors, except $45,000 to the president, $7,500 to the vice-president and $7,500 to the treasurer; and it is alleged in the complaint that the salary of the treasurer was $7,500 a year until 1925, and was then upon the consent of the defendants increased to $10,000.

The relief demanded by the plaintiff is that the defendants be directed at the next election of directors to vote or cause to be voted their stock for the plaintiff's election as one of the directors, and that at the expiration of the present term of office of the treasurer " the defendants use their best endeavors to elect this plaintiff as the treasurer " and that the defendants be adjudged to pay to the plaintiff at the rate of $10,000 a year from May 2, 1928, to compensate plaintiff for the salary he would have received had he been continued as treasurer.

The defendant Stoneham applied to the court for judgment dismissing the complaint on the ground that the court was without jurisdiction of the subject of the action, and on the further ground that the complaint does not state facts sufficient to constitute a cause of action.

The Special Term held in substance that the agreement is void as against public policy, and that as the National Exhibition Company is a New Jersey corporation, this court is without jurisdiction to make an order which will in fact regulate the internal affairs of a foreign corporation.

Among the grounds given for dismissing the complaint is one that the contract is for the control of the board of directors of a corporation resulting in what has been termed a " sterilized board of directors." This contract in nowise provides for the control of the board of directors. It does provide for the election of three of the directors on a board, where there are seven directors and gives the stockholders a free hand to elect the other four directors and does not prevent the election of these four directors by those holding the stock, nor does it require the selection of any particular person

or persons. Assuming, as stated by Stoneham, that this agreement has the effect stated, it is not illegal.

It is a novel argument that, although the agreement gives control of a corporation to the defendant Stoneham which control he has assumed, and the benefits of which he has accepted and is now enjoying, it is unenforcible because illegal. Stoneham evidently was always in control and able to elect a majority of the board of directors and thus protect his own and the interests of the corporation. The agreement simply protected a minority stockholder who had been induced to buy stock and who paid a substantial sum therefor, and at the same time protected the party from whom the stock was purchased until that party was in a position to repurchase a sufficient amount of stock to become the majority stockholder.

It must be borne in mind that this contract is between individuals. The plaintiff seeks to enforce its provisions in an equitable action, for the reason that he has no remedy at law.

In the case of *Standard Fashion Co.* v. *Siegel-Cooper Co.* (157 N. Y. 60) the court said: " The action is for the specific performance of a lawful contract, duly executed by both the parties thereto. It is capable of performance by both, and there is no reason for non-performance by either. A court of equity has jurisdiction of such actions, and the complaint sets forth the contract — readiness to perform on one side, a refusal to perform on the other, and facts showing no adequate remedy at law. A complete cause of action is, therefore, alleged, and the only reason for not awarding general relief to the plaintiff is that its nature is so complicated as possibly to require a multiplicity of orders by the court in its efforts to superintend the details of an extensive and peculiar business. This fact does not deprive the court of jurisdiction, but justifies a refusal in its sound discretion to exercise it. It confers no right upon either party. * * * While it is true that the court, in its discretion, may not hear the cause, or, after a hearing, may refuse relief owing to the difficulty of enforcing its decree, still this does not make the complaint defective, nor authorize a general demurrer, which ' must be founded upon the absolute, certain and clear proposition that, taking the charges in the bill to be true, the bill would be dismissed at the hearing.' "

The plaintiff alleges a contract, a breach thereof, failure of the defendants to perform, their ability to do so, an absence of a remedy at law and persons, and subject-matter over which the court has jurisdiction.

This contract in nowise directly affects the internal affairs of a corporation. It may result in the plaintiff being elected a director

and treasurer of that corporation, and it may not bring about such a result. If the defendant Stoneham refuses to carry out the provisions of the contract, he is no doubt liable for damages to the plaintiff, unless there are reasons why the plaintiff is not entitled to the relief sought because of some acts on his part depriving him of the rights he would otherwise be entitled to enforce by virtue of the terms of the agreement.

Assuming that the plaintiff is correct in his contentions that this contract provides for a sale of stock to him and his continuance as director in a corporation, the complaint would be good.

In *Bonta* v. *Gridley* (77 App. Div. 33) the court held that a complaint alleging a breach of contract between stockholders of a bank and a third person for the sale to the latter of stock in the bank and his election and continuance for five years as cashier is not demurrable, although the contract requires the cashier to use his influence towards retaining the services of the present board of directors.

In *Brightman* v. *Bates* (175 Mass. 105) the court held: " If stockholders want to make their power felt, they must unite. There is no reason why a majority should not agree to keep together." The court also said: " As to the arrangement for the trustees uniting to elect their candidates, the decisions of other States show that such arrangements have been upheld, and we do not think that it needs argument to prove that they are lawful."

In *Manson* v. *Curtis* (223 N. Y. 313) the court held: " It is not illegal or against public policy for two or more stockholders owning the majority of the shares of stock to unite upon a course of corporate policy or action, or upon the officers whom they will elect. An ordinary agreement, among a minority in number, but a majority in shares, for the purpose of obtaining control of the corporation by the election of particular persons as directors is not illegal. * * * Agreements upon a sufficient consideration between them, of such intendment and effect, are valid and binding, if they do not contravene any express charter or statutory provision or contemplate any fraud, oppression or wrong against other stockholders or other illegal object."

If this statement of the law is correct, then the agreement, even though it has the effect, which the parties claim, of providing for the election of directors, would still be valid.

In *Venner* v. *Chicago City R. Co.* (258 Ill. 523) the court said: " * * * a contract by the owners of more than one-half of the shares of stock of a corporation to elect the directors of the corporation so as to secure the management of its property, to ballot among themselves for directors and officers if they could not agree,

to cast their vote as a unit as the majority should decide so as to control the election, and not to buy or sell stock except for their joint benefit, is not dishonest, violative of the rights of others or in contravention of public policy."

The court at Special Term says that, while it does not determine that the continuance of plaintiff as an officer would be detrimental to the corporation, it nevertheless took into consideration that under such an agreement the power might be utilized to retain in the capacity of director one whose influence would prove hurtful. This is simply an assumption, without any ground therefor.

An additional ground given by the court for dismissing the complaint is that plaintiff is attempting to interfere with the internal affairs and management of a corporation organized under the laws of another State.

By this action the plaintiff is seeking to enforce his rights against an individual and does not attempt to regulate the affairs of a corporation organized in another State. It may be that by enforcing the plaintiff's rights, the affairs of a corporation may be incidentally affected, but that may occur in many instances where there is no direct interference with the internal affairs of the corporation and may not be used as a reason to defeat a plaintiff's rights.

While it is true that this corporation was formed under the laws of the State of New Jersey, its offices are in the city of New York; its business is to conduct a National League baseball club in New York city, popularly known as "the Giants." The grounds upon which the team plays are known as the Polo Grounds. The business of this corporation is conducted and transacted in its entirety in the State of New York and not in the State of New Jersey.

In *Babcock* v. *Farwell* (245 Ill. 14) the court said: "The general rule has been declared by the decisions of many courts and has been stated by text writers to be, that the courts of one State will not exercise the power of deciding controversies relating merely to the internal management of the affairs of a corporation organized under the laws of another State or of determining rights dependent upon such management. (Citing cases.)

"As stated in Thompson on Corporations [secs. 7904, 8011], this doctrine obviously has its limitations. Except in cases involving the exercise of visitorial powers, the question is not strictly one of jurisdiction but rather of discretion in the exercise of jurisdiction. The reasons which influence courts of chancery to refuse to interfere in the management of the internal affairs of a foreign corporation are, that the rights arising between a corporation and its members out of such management depend upon the law of the State under which the corporation is organized; * * *"

In *Miller* v. *Quincy* (179 N. Y. 294, 301) the court said: " ' The learned judge, however, was of opinion that this action was more than for a restoration and accounting; that it was, in effect, an action to control the internal management of the corporation itself. Concerning an action of the last character he was of opinion that the corporation could only be called to account in the tribunals of the State which created it. We are not prepared to admit the correctness of the proposition as broadly as stated by the learned justice. If the illegal acts of the directors or of the corporation offended solely against the majesty of the State to which it owed its life, in other words, constituted only public wrongs, the proposition is probably correct; for we are not compelled, nor should we entertain actions simply to redress the outraged dignity of foreign governments. But if such illegal acts also cause injury to the property rights of individual stockholders who are citizens of this State, we cannot see why they are not entitled to obtain full relief in our courts, so far as such relief can be accomplished by acting directly on the persons of the defendants. A contrary rule would, in our judgment, be unfortunate at this time, when, for some reason, the majority of corporate enterprises in this State (those of a *quasi* public nature, such as railroads, etc., excepted) are carried on under incorporations effected under the laws of other States."

In *Wait* v. *Kern River Mining, etc., Co.* (157 Cal. 16, 21) the court said: " Defendant corporation was, as we have seen, organized under the laws of Arizona. But for all practical purposes, according to the record, it is a California corporation. Its contemplated business was all to be transacted in this State, all of its property is here and it does business nowhere else. As was said by Judge LURTON of another corporation in *Young* v. *South Tredeger Co.*, 85 Tenn. 189 [4 Am. St. Rep. 752; 2 S. W. 202], ' its whole tangible and ponderable substance is in this State.' It is a foreign corporation only in the sense that it is created in another State and continues to enjoy corporate life by permission of that State. In every other sense, it is solely a California corporation. So far as it in fact does or can do business at all, it does it solely by permission of this State, and within its borders. Under such circumstances its residence in Arizona, or anywhere else outside of California, is the merest fiction. As to such a corporation, so organized and situated in regard to all its business and property, we can see no good reason why, as was said in the case last cited, ' the fiction as to the *situs* of the corporation entity ought not to yield in the interest of justice to the actual facts,' to an extent sufficient to warrant the holding that the corporation is sufficiently a resident of this State to bring it

within the rule applicable to domestic corporations as to the *situs* of its stock."

An examination of this complaint, therefore, convinces us that the contract alleged therein is in all respects legal and that its enforcement does not interfere with the internal affairs of a corporation organized in a foreign jurisdiction. If we were to assume that it did incidentally affect a corporation so organized, it would not be a sufficient ground to refuse the plaintiff, a citizen of this State, relief in an action in which he was clearly entitled to rights given to him by a contract enforcible in this State.

The judgment and order dismissing the complaint should, therefore, be reversed, with costs, and the motion denied, with ten dollars costs, with leave to the defendant, respondent, to answer upon payment of said costs.

Dowling, P. J., Finch, McAvoy and O'Malley, JJ., concur.

Judgment and order dismissing the complaint reversed, with costs, and motion denied, with ten dollars costs, with leave to the defendant, respondent, to answer within twenty days from service of order upon payment of said costs.