FRANCIS X. McQUADE, Plaintiff, *v.* CHARLES A. STONEHAM and
Another, Defendants.

Supreme Court, New York County, January 12, 1932.

*May & Jacobson* [*Isaac N. Jacobson* of counsel], for the plaintiff.

*Leo J. Bondy* [*Arthur Garfield Hays* of counsel], for the defendant.

McCook, J. The National Exhibition Company, a New Jersey corporation, owned and conducted the New York Baseball Club of the National League, commonly known as the Giants, and leased in connection with their business the Polo Grounds in New York city, where they played their home games.

This action seeks the reinstatement of plaintiff as director and treasurer of the corporation, and damages for his ouster, according to the terms of a contract with the defendants dated February 21, 1919, as modified. It was begun in 1930 by a complaint which has been hitherto sustained by the Appellate Division in *McQuade* v. *Stoneham* (230 App. Div. 57). The allegations of the complaint, to which a copy of the contract was attached, are set out and analyzed in the opinion of that learned court.

At the outset defendants urge three points of law in support of their motion for dismissal of the complaint. The *first* is that plaintiff was a city magistrate and as such could not engage in business without violating section 102 of the Inferior Criminal Courts Act (Laws of 1910, chap. 659, as amd. by Laws of 1915, chap. 531); that his acceptance of the office of treasurer under the contract in suit constituted doing business within the statute and rendered the contract illegal and unenforcible. This, however, is no longer

an open question. The complaint recites that plaintiff was a city magistrate, sets forth in full his official duties as treasurer, and his salary as treasurer under the contract of $7,500 a year, raised in 1925 to $10,000. Defendants in their brief on appeal cited section 102 (*supra*), and contended that the contract was illegal as in violation of it. None the less, the Appellate Division held the complaint sufficient and the contract enforcible. This ruling, together with the decisions of the same court in the *Deuel, Levy* and *Brodsky Cases* (127 App. Div. 640; 198 id. 327, and 232 id. 675, respectively), constrains me to hold that plaintiff was not engaged in business within the meaning of the statutory prohibition. It should also be observed that many of plaintiff's activities in and about the corporation as testified at the trial were outside his duties as treasurer under the contract. Defendant Stoneham in his letter of June 30, 1925, recognized this tendency by urging him to confine himself to those specifically required under the by-laws and the contract. Since plaintiff's contractual and official duties are fully set forth in the complaint, it cannot now successfully be urged that the extracontractual activities just mentioned rendered the contract illegal. Proof is utterly lacking to show that the plaintiff while occupying the office of magistrate did not " devote his whole time and capacity, so far as the public interest demands, to the duties of his office." (§ 102, *supra*.) The views above expressed render unnecessary a discussion of the further and interesting question whether, even had plaintiff's business activities been such as to render him removable as magistrate, persons who knew of his official position and of these activities would be permitted to advance the facts to defeat his recovery under an agreement whose fruits they had enjoyed. For the same reason we need not examine the effect, if any, of his resignation as magistrate after the commencement of the action.

*Second*, it is urged that to afford affirmative equitable relief would be to interfere with the internal affairs of a foreign corporation. This contention also was before the Appellate Division and decided adversely to defendants. The relief is sought solely on a contract against individuals. That it may, or did, incidentally affect the affairs of a foreign corporation does not bar the court from entertaining the cause. (See authorities cited in opinion of *McQuade* v. *Stoneham, supra*, at p. 64.)

*Third*, it is claimed that the agreement is illegal as providing for a sterilized board of directors under *Manson* v. *Curtis* (223 N. Y. 313, at p. 324), where " the parties intended, through its provisions, to divorce the management of the corporate affairs from the board of directors and secure it to the plaintiff." The Appellate Division, however, has held otherwise. The general rule is

to the same effect. Such contracts are not, in and of themselves and without additional circumstances, as for example where an improper motive or object is shown, illegal. (Cook Corporations [8th ed.], § 622-a; Ballantine Manual of Corporation Law [1930], § 174.) The court finds no evidence of such additional circumstances as would bring the case within one of the recognized exceptions to the rule.

With this disposition of the three major preliminary objections, we pass to the merits.

Having held the contract legal and enforcible as against these defendants, we must inquire whether the defendants breached the contract, whether they were justified in breaching the contract, and whether the case is an appropriate one for equitable relief.

The contract required the defendants, in consideration of reciprocal undertakings, to use their best endeavors to continue McQuade in office as treasurer and director. Charles A. Stoneham was to be president, with a salary of $45,000, McGraw vice-president at $7,500, and each was to be also a director. All three were to be, and became, holders of stock. There were seven directors, including the three parties to the contract. The other four were all close friends and nominees of the defendant Stoneham. They had no financial interest in the corporation and it appears that their qualifying shares were handed them by the defendant Stoneham for the express purpose of permitting them to serve. Bondy, afterwards elected plaintiff's successor as treasurer, had been Stoneham's personal attorney for twenty years, continuously representing him in all legal matters; Horace Stoneham was his brother, Robertson his business partner in Charles A. Stoneham & Co., and Dr. Ferguson his intimate and favorite. The defendant Stoneham owned fifty-one per cent of the stock and probably controlled more than that. McGraw's stockholdings were small, but he was important as the practical baseball man and manager of the Giants. There is no doubt that the defendant Stoneham, with his ownership and control of the majority of the stock, and indeed by his sole vote, could have elected plaintiff a director. It seems equally clear that the defendant Stoneham, by merely requesting it, could have induced the four nominees who were directors, and probably McGraw as well, to vote for plaintiff as treasurer, in which event the latter would have been elected. In spite of the protestations of these nominees on the stand, I am convinced that they were acting merely as dummies for the defendant Stoneham. The independence, like the sobriety, of an individual is to be judged by his conduct, rather than his opinion of his own state. It is usually the objective, not the subjective

symptoms which possess probative value and carry weight. Horace Stoneham, Ferguson, Robertson and Bondy held off nearly two and a half years, so they say, at defendant Stoneham's request. By refusing to vote in May, 1928, the defendants convincingly showed that they did not care to have the other four hold off any longer. They failed to raise their voices in McQuade's favor or otherwise to exert any effort, with either the directors or the stockholders, in his behalf. I find that the defendants failed to use their best endeavors to secure plaintiff's election, that they thereby deliberately breached the contract, and that this breach was responsible for his elimination. Plaintiff's cause of action is, therefore, made out.

The defendants plead justification, and most of the proof adduced at the trial was addressed to that defense. Analyzing the evidence, it is found that the relationship between the parties existed for a period of approximately ten years, that is, from 1919 to 1928, although both defendants were well acquainted with plaintiff long before. McQuade was the man who originally brought the defendants together to buy a controlling interest in the National Exhibition Company and carry on its business. The enterprise became a great financial success. Numerous instances of alleged disputes and altercations, generally in private, have been spread upon the record. At most they show, up to 1925, the differences normally existing between human beings embarked upon the same adventure. That disputes, quarrels and even bitter words occur between partners or fellow-directors over a period of years is not unnatural or unusual. They become important only when their frequency and intensity increase to an extent which makes orderly and efficient regulation impossible. In this case I find that the quarrels and disputes which existed between the parties, in so far as they were chargeable against plaintiff, did not at any time before May, 1928, affect to any such extent the orderly and efficient administration of the corporation's business.

The charges of unprovoked assault on various persons occurring on the premises and in connection with the corporate business, consistent and deliberate trouble-making, and threats against other officers, are not sustained by the evidence. It is plain McGraw did not take seriously what he testified McQuade said about "putting a pill in Stoneham's soup." I find no evidence of any other threat, and plaintiff denies he made this one. The improper use of tickets, passes and admission privileges is at most an irregularity. If it was regarded as important, numerous remedies were at hand, none of which was then employed.

It is further charged that plaintiff used abusive, insulting

language. This has not been held a sufficient reason for removing a director, even though "highly indecorous and deserving of the censure of all honorable men." (3 Thompson Corp. [3d ed.] § 1929; *Fuller* v. *Plainfield, etc.,* 6 Conn. 532, at p. 546.) In that connection one may remark that this cause involves dealings with each other on the part of three persons who all admit the use on occasion of strong arm, strong language and strong drink.

The mysterious payment of the commission of $8,150 for collecting the mysterious $81,500 is interesting but unimportant. It did not affect the National Exhibition Company. I find that plaintiff did not betray corporate secrets, nor misuse corporate records. Defendants' present protestations that plaintiff was unfit to occupy the office of treasurer are perhaps best answered by their own conduct in raising his salary to $10,000 in 1925; by far the greater part of these alleged acts of misconduct had occurred, as has already been observed, before that year. It scarcely lies in Stoneham's mouth to intimate that McQuade blackmailed him into increasing a salary or paying a commission by threatening to make him repay Stoneham's lawful debts to the corporation.

Some importance may be attached to plaintiff's non-compliance with the terms of the contract which required offering the defendants an opportunity to purchase their specified percentages of the stock he subsequently acquired. But this matter seems to have been adjusted to the outward satisfaction of all concerned, and for any breach of the contract the defendants have an adequate remedy. They did not prove at the trial damage from this cause. I do not consider plaintiff's omission in this regard sufficiently substantial to warrant abandonment by defendants of the entire contract.

The written documents received in evidence disclose the true source of conflict between the parties and the basic reason for defendants' violation of their agreement with him.

In January, 1925, when Stoneham was being tried in the Federal courts, he withdrew from the corporation $125,000 for his personal use. The checks were signed by him as president and by one Tierney as assistant treasurer. The usual procedure of obtaining plaintiff's signature was not followed. Stoneham's explanations are inconsistent and contradictory. As soon as he learned of the loan plaintiff protested, and demanded security on behalf of the corporation; security was furnished, at what date is relatively unimportant. Whatever may have been the motives, whether personal advantage or protection against personal criticism, plaintiff was also protecting the interests of the corporation and its stockholders when he took that position. Stoneham's financial situation at that time, in view of the serious litigations he was

defending, was none too secure. It was not the first time McQuade had reminded him of his duty to preserve a proper relation of loans to surplus, but now Stoneham was under fire, his back to the wall. He was forced by the plaintiff's insistence to deposit security and (as now appears) bitterly resented it, but for the moment he seems to have said nothing and bided his time.

In June, 1925, according to the plaintiff, he demanded reduction of the loans, and in August renewed his demand, being thereupon informed by McGraw that if he did not " lay off Stoneham " he would be removed as treasurer. At a meeting in December of the same year Bondy was elected treasurer, three directors voting for Bondy, McGraw voting for McQuade, and defendant Stoneham not voting. Ferguson was absent. Had Stoneham voted for plaintiff, a tie must have resulted and Bondy would have failed of election.

In spite of Bondy's election in December, 1925, he did not qualify until May 2, 1928. Plaintiff's theory is consonant with the facts and probabilities: that Bondy's election without subsequent qualification was a sword of Damocles suspended over McQuade's head. Were the latter to run counter to any of Stoneham's whims he could be instantly removed. So long as he behaved himself by abstaining from " interference," viz., by acting as a rubber stamp for Stoneham, his $10,000 a year treasurership was secure. Defendants' explanation, that the moratorium originated in a desire to avoid friction or dispute which might prejudice the negotiations then pending or about to be commenced for selling out their stock, does not account for what followed, nor for the sequence of events.

In March, 1926, without informing defendants of the fact, plaintiff went to Boston and persuaded a large minority stockholder who resided there to institute a stockholder's action to compel an accounting and repayment of Stoneham's loans, together with interest. This apparently was more effective than all McQuade's previous exhortations, oral and written. A dividend was declared of $14 a share, yielding over $80,000 to Stoneham, for application in reduction of his loan, which thereafter was paid in full. Interest, however, was not forthcoming — was not even set up on the books. Plaintiff testified that he spoke to Stoneham several times about paying interest. Stoneham denies the conversations, but interest was set up on the books for the first time in September, 1926, and the attorney for the Boston stockholder refused to discontinue the suit until interest had been paid.

The plaintiff was not actually removed as treasurer until May 2, 1928. Only two other events of any moment occurred between December, 1925, and May, 1928, the quarrel between the plaintiff and Bondy and that between plaintiff and McGraw. The first,

provoked by Bondy, was a personal matter, not affecting the corporation, the second was likewise a personal matter, entirely divorced from plaintiff's duties as treasurer or director. On May 2, 1928, a special meeting of the board of directors was called on two days' notice. Stoneham then and there delivered a letter and check covering interest on his loan. Immediately and at the same meeting came another election of Bondy in place of plaintiff as treasurer. This time he qualified. The coincidence cannot be escaped. Until interest was paid, the Boston stockholder's action, which the defendants by this time attribute to McQuade, might be pressed. Once that had been discharged, defendants ceased to fear either the action or McQuade. Then and then only did the sword fall.

My conclusion on the facts is that plaintiff, far from being disloyal to the corporation, had its interests and those of minority stockholders in view. His conduct at all times, whatever its purpose or character, produced the effect of benefiting the corporation and its minority stockholders. If "loyalty" to Stoneham was inconsistent with duty to the stockholders, the former must yield. The court finds that plaintiff was ousted from office only because he persisted in challenging Stoneham's power over the corporate treasury. Having undertaken in 1925 to discipline him for doing his duty, defendants cannot complain of his failure to take them into his confidence before he put outside pressure upon them.

These conclusions are fortified by absence from the documents in evidence of any contemporary protest by either of the defendants or any of the directors or stockholders against any misconduct on the part of plaintiff. That no criticisms were then advanced is an indication that plaintiff's alleged misconduct, so far as it existed, was not seriously regarded by his associates, that it is advanced now as an afterthought and makeweight, and that the real objection to plaintiff was his temerity in challenging the dictatorship of Stoneham. Stoneham's letter of June 30, 1925, already mentioned, confirms this view. Mr. Bondy's action in holding his salary in escrow, apparently to await the result of litigation, does not point to a conviction that the ouster was justified.

Defendants contend that under the evidence the plaintiff cannot recover because of the maxim that one must come into equity with clean hands. Equity is not a school of manners. Equity is a system of justice. Plaintiff is entitled to relief, the form and extent of which, alone, remain for consideration.

The complaint states a cause of action for equitable relief and was not subject to demurrer, as held by the Appellate Division. But the equitable relief proposed must be practicable. Not in

every instance will full relief be forthcoming — especially where the facts as disclosed at the trial indicate that its award may prove improvident or harsh, and the enforcement difficult and nugatory. (See Pom. Spec. Perf. Cont. [3d ed.] §§ 288–290.)   In such a case the court, " in the exercise of its equitable powers,   *   *   *   may stay its hand, and refuse its mandate of specific performance." (*Kleinberg* v. *Ratett,* 252 N. Y. 236, at p. 240.)   Plaintiff was denied re-election to the treasurership as early as December, 1925.   Ever since May, 1928, he has been out as treasurer and ever since November of the same year out as director.   To this state of affairs all the directors and all the stockholders, with the exception of plaintiff, have become accustomed.   The court infers, and plaintiff has not shown the contrary, that were he restored in either capacity, the bitterness accumulating since January, 1925, which has now become public property through the preliminary motions and the trial, would prevent harmonious functioning by the board of directors and create, there and at meetings of the stockholders, an atmosphere inconsistent with efficiency.   Apparently those at present acting as directors and officers do and will work in harmony.   Of deep interest to a court of equity are the rights and welfare of minority stockholders, whether parties or no, and it must balance, in so far as they are concerned, the good plaintiff might do them by returning to his former positions, with the harm he might do through compulsory reinstatement.   Prejudicial conduct by the others in plaintiff's absence could be sufficiently curbed and even averted, should the occasion arise, by the employment of the usual stockholders' remedies, in which plaintiff may furnish his aid and advice.

In the light of all that has happened I decline to force plaintiff upon a majority of hostile fellow-directors and officers, or upon innocent stockholders, strangers to this suit.   Specific performance is not a matter of absolute right but of sound judicial discretion. (Pom., *supra,* §§ 35, 45, 46; *Kleinberg* v. *Ratett, supra; Trustees of Columbia College* v. *Thacher,* 87 N. Y. 311; cases collected under note, 65 A. L. R. 7.)   To decree it now might seriously disorganize the corporate entity and endanger the interests of its stockholders, not to mention the many individuals dependent upon professional baseball for their livelihood.   (See *Curran* v. *Holyoke, etc.,* 116 Mass. 90, at p. 92, and cases cited in Pomeroy, *supra,* § 181-a, as to the court's duty to consider the rights of innocent third persons, not parties to the contract or the litigation.)   It is equally the court's duty to weigh the public interest. (*Conger* v. *N. Y., W. S. & B. R. R. Co.,* 120 N. Y. 29, at p. 32, and cases cited by Pomeroy, *supra.*)   There may be exigencies in cases involving the reinstatement of a director or officer of a corporation where the remedy of

specific performance should not be denied. Suffice it to say that in my judgment the case before us is one falling within the general class where it has been held wiser to withhold that remedy. (3 Cook Corp. [8th ed.] § 622-a, at p. 2191, and cases cited.)

A court of equity may withhold equitable relief, such as injunction and specific performance, and yet refuse to dismiss the complaint but grant damages and make plaintiff whole in so far as compatible with the interests of others. (*Sadlier* v. *City of New York*, 185 N. Y. 408; *Wappler* v. *Woodbury Co.*, 246 id. 152, at p. 156.) Plaintiff is accordingly awarded damages at the rate of $10,000 per year from May 2, 1928, to the date of the entry of decree herein, together with interest on the installments of salary as they would have accrued had the contract been carried out. McGraw finally chose to cast his lot with the more influential man. He broke the agreement as much as Stoneham, because the measure of his duty and his failure alike was his own best endeavor. The court in imposing damages will not differentiate between them.

The burden of showing the possibility of mitigation of damages rested upon the defendants and they have not sustained it. (*Losei Realty Corp.* v. *City of New York*, 254 N. Y. 41, at p. 48; see notes, 15 A. L. R. 751 and 28 id. 736.) No damages are asked for defendants' failure to elect plaintiff a director and none are awarded, although defendants do not seriously dispute that he is entitled to them; in any event they could not be more than nominal. The court has purposely refrained from awarding at this time prospective damages, because of a possibility that the plaintiff may in the future be restored, by voluntary action, to both positions. It still remains open to the directors and stockholders, as advised, either to reinstate plaintiff or to confirm his present outside status, and the parties must alike take the consequences of the lawful action of these two bodies, whatever it may be. This decision and the decree to be entered thereon will in no wise preclude plaintiff from the future collection of such damage as further continuing breach of the contract may cause.

Motion to dismiss the complaint is denied. Plaintiff's motion to strike out defendants' Exhibit AX is denied. The counterclaims are dismissed. Judgment for plaintiff in accordance with this opinion. Costs will be allowed. Settle findings and decree.